UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARIELA DE LA ROSA, Individually and as the Personal Representative and Administrator of the Estate of Felix Antonio De La Rosa Alvarez,

                                 Plaintiff,

    -against-


THE UNITED STATES OF AMERICA;
GEORGE IOANNIDIS (Supervisor of Manhattan Office, Homeland Security Investigations);
CHRISTOPHER REID (Special Agent, Homeland Security Investigations);
DR. BRUCE BIALOR (Doctor, Bureau of Prisons);
J.F.K. ADVANCED MEDICAL P.C.;
DR. MANUEL CEJA; DR. PRIYESH PATEL; DR. B.V. REDDY;
and
JOHN DOE(S) (Other unknown individuals),

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 20-CV-1128


**FIRST AMENDED COMPLAINT**


**JURY TRIAL DEMANDED**

Plaintiff Mariela De La Rosa ("Plaintiff"), individually and as the administrator of the Estate of Felix Antonio De La Rosa Alvarez ("Mr. De La Rosa" or "decedent"), by and through her attorneys, Colson Law PLLC and Gelber & Santillo PLLC, for her complaint against the United States of America, J.F.K Advanced Medical P.C. ("JFK Medical"), George Ioannidis, Christopher Reid, Dr. Bruce Bialor, Dr. Manuel Ceja, Dr. Priyesh Patel, Dr. B.V. Reddy, and John Does (other unknown individuals who arranged the narcotics transaction involving Mr. De La Rosa, who knew the type and quantity of drugs ingested by Mr. De La Rosa and/or who treated or failed to treat Mr. De La Rosa, including but not limited to employees of the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), Drug Enforcement

Administration ("DEA"), Bureau of Prisons ("BOP"), Metropolitan Detention Center ("MDC") and JFK Medical), (collectively, "Defendants"), alleges upon information and belief as follows:

## NATURE OF THIS ACTION

1.      This is an action to recover damages arising from the wrongful death of Felix Antonio De La Rosa Alvarez, a beloved husband and father of six children, who tragically died of an acute heroin overdose while in the custody of the United States Government.  The chain of events leading to Mr. De La Rosa's death was set in motion by the United States Government, and his tragic death could have been prevented by the Defendants at multiple turns.

2.      From the outset, the United States Government treated Mr. De La Rosa as an expendable pawn in a reckless sting operation against an overseas target.  Agents from the DEA and HSI arranged with the overseas target to purchase a large quantity of narcotics.  Using federal funds, the DEA and HSI agents paid the overseas target a deposit for the narcotics and agreed to pay the balance upon delivery, with full knowledge that the drugs would be transported via a human courier who would ingest pellets of the drugs, then board a plane from the Dominican Republic to the United States with no medical supervision.  The agents' reckless actions not only demonstrate a shocking and wanton disregard for human life, but upon information and belief, they also violated federal policy.

3.      Desperate to provide for his family, Mr. De Le Rosa agreed to act as the drug courier and swallowed over 60 pellets of heroin before boarding a plane to the United States.  Upon landing at JFK airport on February 23, 2018, he was detained by federal agents, then arrested after x-rays and testing, performed by JFK Medical, revealed that his body contained pellets of narcotics.  The DHS, JFK Medical and/or their employees and agents assumed the responsibility of monitoring Mr. De La Rosa until he safely passed the pellets.

4.      Despite orchestrating the drug deal that put Mr. De La Rosa in mortal danger, the DEA and HSI agents who had arranged the transaction and knew the type and approximate quantity of drugs that Mr. De La Rosa had swallowed did not inform anyone at JFK Medical about the quantity of drugs that he was transporting inside his body.

5.      JFK Medical monitored Mr. De La Rosa from February 23, 2018 until February 28, 2018, during which time he passed approximately 33 pellets of narcotics.  From February 24-28, 2018, x-ray and radiograph images continued to reveal the presence of foreign objects in Mr. De La Rosa's abdomen and pelvic regions, but JFK Medical radiologists who took and examined these images did not properly interpret them or clearly communicate the results.  In addition, on February 28, 2018, JFK Medical Dr. Manuel Ceja committed malpractice and egregiously concluded that that the x-rays performed by JFK Medical "fail[ed] to reveal the presence of retained foreign bodies" and that Mr. De La Rosa was "fit for confinement."

6.      Despite the fact that JFK Medical and the United States Government assumed a duty of care to ensure that Mr. De La Rosa safely passed all of the pellets he had swallowed, Mr. De La Rosa was released from JFK Medical on or around February 28, 2018 into the custody of the U.S. Customs and Border Protection ("CBP"), transported to the MDC and placed into the general population with over 30 pellets of narcotics still in his body.  The medical staff at the MDC who examined Mr. De La Rosa shortly after his arrival failed to perform any screening to determine if he still had pellets of narcotics in his body.  One of these pellets ruptured a few days later, killing Mr. De La Rosa at the age of 55.

7.      Had DEA and HSI agents not orchestrated a deadly sting operation in contravention of federal policy and basic human decency, had any of the government agents who arranged the heroin transaction come forward and informed JFK Medical of the quantity of drugs that Mr. De

3

La Rosa had swallowed, had JFK Medical's doctors correctly read the x-rays and radiographs showing that there were additional pellets in Mr. De La Rosa's body (or acted with reasonable care before releasing him), or had Dr. Bruce Bialor performed adequate medical screening of Mr. De La Rosa when he arrived at the MDC, Mr. De La Rosa would not have died. The actions of each of these Defendants were independent proximate causes of Mr. De La Rosa's death.

8.      Mr. De La Rosa's tragic death is a direct and proximate result of the medical malpractice, gross negligence, negligence and recklessness of the United States, JFK Medical, the agents and employees of these Defendants, and/or the unknown individuals who will be named after further discovery. While Mr. De La Rosa's family will never be made whole from the loss of its patriarch, Plaintiffs seek money damages from the Defendants arising out Mr. De La Rosa's wrongful death. More fundamentally, Plaintiffs seek to hold Defendants accountable for their callous disregard of Mr. De La Rosa's life.

**JURISDICTION AND VENUE**

9.      This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, the Fifth and Eighth Amendments to the United States Constitution and New York state common law. Liability of the United States is predicated on 28 U.S.C. § 1346(b)(1) and § 2674 because the wrongful death and resulting damages that form the basis of this complaint were proximately caused by the negligence, medical malpractice, wrongful acts and/or omissions of the employees of the United States through its agencies, the DHS, DEA and the BOP. Certain of these employees were acting within the course and scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual under the laws of the State of New York.

10.	On August 29, 2019, Plaintiff submitted her claim to the DHS.  On January 7, 2020, Plaintiff's counsel received a right to sue letter from U.S. Immigration and Customs Enforcement denying the claim.  On February 25, 2020, Plaintiff's counsel received a right to sue letter from CBP denying the claim and filed this Complaint within six months of said date in accordance with 28 U.S.C. § 2401(b).

11.	The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a) and 1346(b).

12.	This Court has supplemental jurisdiction over Plaintiff's pendent state law claims under 28 U.S.C. § 1367(a).

13.	The acts complained of occurred in the Eastern District of New York and so venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) and § 1402.

## **THE PARTIES**

14.	Felix Antonio De La Rosa Alvarez was a citizen of the Dominican Republic.  At the time of his death on March 3, 2018, he was detained at the MDC in Kings County.

15.	Mariela De La Rosa is Mr. De La Rosa's daughter and was appointed administrator of his estate on August 28, 2019.  Ms. De La Rosa resides at 2619 Barclay Street, Baltimore MD 21218.

16.	On information and belief, JFK Medical is a professional corporation organized under the laws of the State of New York, with its principal place of business at JFK International Airport, Building 75, Suite 249, Jamaica, New York 11430.  On information and belief, JFK Medical is a provider of medical services, and has an arrangement with DHS to provide x-rays and/or medical services to travelers who are detained by DHS upon entering the United States.

17.    Dr. Manuel Ceja and the John Doe employees, contractors and agents from JFK Medical work at JFK Medical's offices in Jamaica, New York, performed x-rays of Mr. De La Rosa and provided treatment and care to Mr. De La Rosa.

18.    Dr. B.V. Reddy is a diagnostic radiologist and nuclear medicine physician, a body/MRI and breast imaging specialist and an ER radiologist with JFK's Medical offices in Jamaica, New York, and performed x-rays of Mr. De La Rosa.

19.    Dr. Priyesh Patel is a board certified diagnostic radiologist and musculoskeletal and spine imaging specialist with JFK Medical's offices in Jamaica, New York and performed radiographs of Mr. De La Rosa.

20.    The United States of America is an appropriately named defendant for the actions and omissions of DHS (and HSI), the DEA, the BOP, and the MDC, under the Federal Tort Claims Act.

21.    Upon information and belief, George Ioannidis is a supervisor of the HSI office in Manhattan located at 601 W. 26th Street, Room 726, New York, NY, 10001.

22.    Christopher Reid is a Special Agent with HSI, which is part of DHS.

23.    Dr. Bruce Bialor is an employee of the Bureau of Prisons Health Service at the MDC.

24.    The John Doe Individuals are: (1) unknown United States employees involved in arranging the lethal narcotics transaction involving an internal human courier and/or those who knew the quantity and type of drugs swallowed by Mr. De La Rosa but did not share this information with JFK Medical or the BOP, (2) unknown individuals who provided medical treatment to and/or failed to provide medical treatment to Mr. De La Rosa, and will be named as defendants when their names are discovered.

25.    The individually named governmental defendants, George Ioannidis, Christopher Reid, Dr. Bruce Bialor, and the John Does, are appropriate defendants under *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) and *Carlson v. Green*, 446 U.S. 14 (1980).

## **FACTUAL ALLEGATIONS**

26.    This lawsuit seeks damages arising from Defendants' gross negligence, negligence, recklessness, and medical malpractice, which caused Mr. De La Rosa's death on March 3, 2018.

***United States Federal Agents Arranged the Narcotics Transaction, Agreeing that the Narcotics Could be Transported Inside of an Individual, Despite the High Risk of Death***

27.    In the weeks prior to Mr. De La Rosa's death, HSI and DEA agents were investigating an overseas narcotics trafficker.  Through the use of a confidential source, HSI and DEA agents posed as buyers of narcotics and arranged a transaction with the overseas target.

28.    At some point, HSI and DEA agents became aware that the overseas target planned to transport narcotics from the Dominican Republic to the United States by recruiting a human courier to swallow pellets containing heroin.  Despite the extreme danger to the health and safety of the courier, the HSI and DEA agents involved agreed.  Upon information and belief, the supervisor of the HSI office in Manhattan, Ioannidis, specifically approved the operation.  Upon information and belief, Ioannidis and the other DEA and HSI agents who agreed that an internal drug courier could be used breached governmental policy.

29.    HSI and DEA agents used federal funds to pay the overseas target a deposit for the narcotics and agreed to pay the balance upon delivery of the narcotics in the United States.  The ultimate buyer of the narcotics was the United States Government.

30.    On February 23, 2018, Mr. De La Rosa travelled from Santo Domingo, Dominican Republic to JFK Airport in Queens, New York.

31.     Mr. De La Rosa's travel itinerary was relayed by HSI and/or DEA agents to CBP officers at JFK airport in an effort to create the appearance of a random stop targeting Mr. De La Rosa.  However, the stop of Mr. De La Rosa was anything but random, since the entire narcotics transaction had been arranged by federal agents.

*Mr. De La Rosa Arrived in the United States and was Detained*
*and Transferred to the Care of JFK Medical*

32.     Upon arrival, CBP officials selected Mr. De La Rosa for an enforcement examination and transported him to JFK Medical for an x-ray.

33.     Mr. De La Rosa was x-rayed at JFK Medical on February 23, 2018.  The x-ray showed the presence of foreign objects in Mr. De La Rosa's body.  Dr. Manuel Ceja reviewed Mr. De La Rosa's x-rays and treated and consulted with Mr. De La Rosa while he was at JFK Medical.

34.     Over the next few days, Mr. De La Rosa passed approximately 31 pellets of narcotics while in the care of JFK Medical's CBP Medical Monitoring Unit.

35.     On February 26, 2018, a criminal complaint was filed against Mr. De La Rosa in the United States District Court for the Eastern District of New York.  Defendant Christopher Reid, a Special Agent with HSI, signed the complaint.  In the complaint, Defendant Reid stated that, as of February 26, 2018, Mr. De La Rosa "ha[d] passed approximately 30 pellets" which had tested positive for heroin and cocaine.  It further stated that Mr. De La Rosa would "be detained at the JFK medical facility until such time as he has passed all the pellets contained within his intestinal tract."

*JFK Medical Committed Medical Malpractice in its Care of Mr. De La Rosa*
*and Discharged Him with 37 Pellets of Narcotics Remaining in his Body*

36.     Between February 24 and 28, 2018, Dr. B.V. Reddy and Dr. Priyesh Patel, radiologists with JFK Medical, conducted x-rays and radiographs of Mr. De La Rosa to determine

if there was still evidence of pellets in his system. Even though the x-ray and radiograph images clearly showed foreign objects inside of Mr. De La Rosa's body, both Dr. Reddy and Dr. Patel failed to accurately describe these results in their February 27 and 28, 2018 reports. Dr. Reddy and Dr. Patel's reports deviated from acceptable standards of medical care and constituted medical malpractice.

37.     JFK treating physician, Dr. Ceja, was also negligent and committed malpractice. He released Mr. De La Rosa despite receiving a February 28, 2018 report stating that: "[i]nferior to the pubic symphysis, *there are two tubular densities*, which are indeterminate and may be related to a penile implant, or *represent foreign objects* in the lower pelvic region. Correlate clinically. . . . The extreme right lateral abdomen was not included on the study limiting evaluation of this region." (Emphasis added). Based on this report, and his knowledge that Mr. De La Rosa had significant drug pellets in his abdomen in the prior days, Dr. Ceja should have ordered additional testing to ascertain whether the tubular densities identified in the report were heroin pellets.

38.     Instead, Dr. Ceja concluded in a separate report dated the same day, February 28, 2018, that "[r]epeat plain abdominal X-ray fails to reveal presence of retained foreign bodies. Subject is fit for confinement and discharged to the disposition of the United States Customs & Border Protection." Dr. Ceja's conclusions were unsupported by both Dr. Reddy's x-rays and Dr. Patel's abdominal radiograph, deviated from acceptable standards of medical care, and constituted medical malpractice.

39.     Defendant Reid filed a supplemental affidavit with the District Court for the Eastern District of New York on March 1, 2018 and reported that Mr. De La Rosa had passed a "total of

33 pellets" containing approximately 778 grams of narcotics, and that the pellets had been retested and they all contained heroin.

40. Upon information and belief, Ioannidis, Reid and the other HSI and DEA agents who knew the approximate quantity of drugs swallowed by Mr. De La Rosa – and knew that he had swallowed far more than 778 grams of heroin -- did not provide any information to JFK Medical or take any action to stop Mr. De La Rosa's discharge from JFK Medical.

41. Mr. De La Rosa was transferred to the MDC in Brooklyn on or around March 1, 2018, while he still had 37 pellets remaining in his intestinal tract.

42. JFK Medical and Dr. Ceja failed to adequately screen Mr. De La Rosa to ensure that all of the pellets had safely been passed before discharging him and releasing him to the MDC on or about March 1, 2018. Further, the federal agents who knew the quantity of narcotics swallowed by Mr. De La Rosa were grossly negligent and acted in a reckless manner, and in utter disregard for Mr. De La Rosa's life, by not revealing this crucial information to JFK Medical.

### The BOP Failed to Conduct its Own Examination of Mr. De La Rosa to Determine if Pellets Remained in his System

43. The BOP and Defendant Dr. Bialor, who signed off on Mr. De La Rosa's medical examination when he reached the MDC, also failed to adequately examine and monitor Mr. De La Rosa once he reached the MDC to ensure that the life-threatening pellets were no longer in his system and/or that, if still in his system, they could safely be passed.

44. Records from the BOP indicated that Mr. De La Rosa complained of back pain when he was examined by BOP medical staff upon his arrival there, and therefore, they should have examined him further to determine if the pain was related to the heroin pellets. The BOP was aware of the charges against Mr. De La Rosa and therefore knew or should have known of this risk.

***Defendants' Medical Malpractice, Negligence, Recklessness and Repeated Failures
at Every Juncture Caused Mr. De La Rosa's Death***

45. The failure of JFK Medical, DHS, BOP, Defendants Ceja, Patel, Reddy, Bialor, and/or John Doe(s) to detect over 30 remaining pellets in Mr. De La Rosa's body and/or provide proper monitoring to Mr. De La Rosa to ensure that he had safely passed the pellets fell below an objective standard of reasonable care.

46. Moreover, DHS and DEA breached government policy and owed a duty of care to ensure Mr. De La Rosa's safety since HSI and DEA agents orchestrated the narcotics transaction and agreed to use an internal drug courier. Their failure to provide information to JFK Medical regarding the quantity of drugs transported by Mr. De La Rosa constituted a breach of that duty of care.

47. Upon information and belief, JFK Medical should have conducted further x-rays, radiographs, CT scans, ultrasounds, and/or other types of internal medical imaging of Mr. De La Rosa after x-ray and radiograph images taken on February 27-28, 2018 showed that there were likely still pellets inside him. Mr. De La Rosa should have been given laxatives and other drugs to help him safely pass the remaining pellets and, if the pellets were not moving through his intestinal tract, Defendants should have arranged for the pellets to be removed surgically. In addition, Mr. De La Rosa should have been closely monitored in a medical facility so that if one of the pellets ruptured, he could have been given life-saving medications to counteract the effects of narcotics and prevent death. These standard procedures for the medical treatment of drug couriers were not followed.

48. Instead, Dr. Patel and Dr. Reddy issued defective radiology reports that did not accurately describe the x-ray and radiograph images of Mr. De La Rosa's abdomen. In addition,

Dr. Ceja ignored or misread Dr. Patel's and Dr. Reddy's reports and determined, with no additional testing, that Mr. De La Rosa had passed all the pellets.

49.     As a direct and proximate result of the failures of JFK Medical, DHS, DEA and BOP to fulfill their duties of care, on March 3, 2018, Mr. De La Rosa was found dead in his jail cell.  The actions of each of these Defendants were all independent proximate causes of Mr. De La Rosa's death because each of these actions was a substantial cause of the events leading to Mr. De La Rosa's death.

50.     The autopsy report prepared by the Office of the Chief Medical Examiner for the City of New York identified Mr. De La Rosa's cause of death as acute heroin and diltiazem intoxication from the rupture of a pellet containing drugs.  It further stated that Mr. De La Rosa had 37 pellets in his intestinal tract when he died.

51.     Defendants JFK Medical, Dr. Ceja, Dr. Patel, Dr. Reddy and the medical staff at the BOP, acting by and through their agents, employees, physicians, nurses, and representatives, were grossly negligent, negligent and reckless and fell below that degree of care, skill, and learning expected of a reasonably prudent health care provider in the profession or class to which Defendants belong in the State of New York, acting in the same or similar circumstances.

52.     Upon information and belief, JFK Medical, the DHS, the DEA and the BOP have specific procedures and protocols that they are supposed to follow when they take custody of a drug courier such as Mr. De La Rosa, and they failed to follow those procedures, resulting in Mr. De La Rosa's death.

53.     The Defendants' gross negligence, negligence, medical malpractice, breach of the applicable standard of medical care, and callous disregard for the health and safety of Mr. De La

Rosa was the direct and proximate cause of his death. If Mr. De La Rosa had been properly monitored and treated, he would not have died.

### *The Cover-Up*

54.     After Mr. De La Rosa's death, the supervisor of the HSI Manhattan office who approved the narcotics operation, Ioannidis, began a concerted effort to obstruct any investigation of HSI and DEA's role in Mr. De La Rosa's death. Upon information and belief, Ioannidis has been contacting, coaching, and pressuring witnesses to omit critical details regarding the Government's investigation and its actions leading to Mr. De La Rosa's death.

### *The Catastrophic Toll of Mr. De La Rosa's Death on His Loving Family*

55.     In the Dominican Republic, Mr. De La Rosa was the beloved patriarch of a large family. He left behind a wife and six children, including a minor son and daughter for whom he provided financial support.

56.     Mr. De La Rosa's death has been emotionally and financially catastrophic for his family. Mr. De La Rosa ran a convenience store and a factory in the Dominican Republic, but, following his death, the family was forced to sell the convenience store and has lost their home to foreclosure. Mr. De La Rosa's wife and adult daughter have also struggled to provide for his minor children, and have incurred debilitating expenses arising out of his death.

57.     The Plaintiffs are entitled to damages under N.Y. Est. Powers & Trusts Law § 5-4.3 and/or the Federal Tort Claims Act, 28 U.S.C. § 2674, as applicable.

### AS AND FOR THE FIRST CAUSE OF ACTION
### (Wrongful Death/ Negligence Against the United States, Pursuant to the Federal Tort Claims Act)

58.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

13

59.     The United States (via the DHS and DEA) owes a duty of care to individuals, like Mr. De La Rosa, who are involved in its investigations.  It was reasonably foreseeable that, by initiating a narcotics operation and paying an overseas target for narcotics that it knew would be smuggled into the United States via an internal courier, one of those pellets could rupture, killing the individual.  That risk was compounded when the HSI and DEA agents who were involved in the investigation failed to disclose to the CBP or JFK Medical the quantity of drugs that it purchased and that Mr. De La Rosa had swallowed.

60.     The United States (via the DHS, DEA and BOP) also owes a duty of care to safeguard detainees and inmates like Mr. De La Rosa.  It was reasonably foreseeable that one of the heroin pellets inside of Mr. De La Rosa would rupture and that he would die if he were removed from JFK Medical and transferred to the MDC, without putting in place any special procedures to ensure that Mr. De La Rosa safely passed the heroin pellets that were in his intestinal tract.

61.     Mr. De La Rosa died on March 3, 2018 as a direct and proximate result of the wrongful and negligent actions taken by the DHS, DEA, BOP and their employees.  The DHS and DEA manufactured the undercover operation and paid for the drugs that Mr. De La Rosa swallowed.  The DHS and DEA officials who were involved in the investigation then withheld critical information from the CBP and JFK Medical regarding the quantity of drugs that Mr. De La Rosa was transporting.  Finally, the DHS removed Mr. De La Rosa from JFK Medical and transferred him to the custody of the BOP (at the MDC), without putting any special procedures in place for Mr. De La Rosa's welfare.  These actions constituted a breach of the duty of care that these entities owed to Mr. De La Rosa and were a substantial cause of his death.

62.     Mr. De La Rosa could have pursued this action against the United States if he had not died.  Because he has died, Ms. De La Rosa is pursuing this claim as the administrator of Mr. De La Rosa's estate.

63.     Mr. De La Rosa's wife and six children have suffered damages as a result of his death, including, but not limited to: the loss of his future earnings; out-of-pocket funeral expenses; the value of parental support, nurturing, care and guidance to his surviving children; and the value of services that he provided to his family, including but not limited to household repairs and maintenance, and damages otherwise available at law or in equity.  In addition, Mr. De La Rosa's estate is entitled to recover for the conscious pain and suffering that he experienced prior to his death.

64.     Mr. De La Rosa's estate is entitled to recover these damages under New York law and the Federal Tort Claims Act.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**(Wrongful Death/ Medical Malpractice Against the United States, Pursuant to the Federal Tort Claims Act)**

65.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

66.     The BOP/ MDC medical staff, including Dr. Bialor, knew or should have known that Mr. De La Rosa had been detained because he had swallowed pellets of narcotics.  The BOP/ MDC medical staff departed from acceptable standards of medical practice by failing to examine, x-ray, or screen Mr. De La Rosa to determine if he had any remaining pellets in his body, and to properly care for him while he safely passed the heroin pellets that were in his intestinal tract.

67.     This departure from acceptable medical standards was the proximate cause of Mr. De La Rosa's death.

68.     Mr. De La Rosa could have pursued this action against the United States if he had not died.  Because he has died, Ms. De La Rosa is pursuing this claim as the administrator of Mr. De La Rosa's estate.

69.     Mr. De La Rosa is survived by his wife and six children who have suffered damages as a result of his death, including, but not limited to: the loss of his future earnings; out-of-pocket funeral expenses; the value of parental support, nurturing, care and guidance to his surviving children; and the value of services that he provided to his family, including but not limited to household repairs and maintenance, and damages otherwise available at law or in equity.  In addition, Mr. De La Rosa's estate is entitled to recover for the conscious pain and suffering that he experienced prior to his death.

70.     Mr. De La Rosa's estate is entitled to recover these damages under New York law, and the Federal Tort Claims Act.

71.     After receiving decedent's records from JFK Medical on March 20, 2020 and April 30, 2020, Plaintiff's counsel filed a certificate of merit, as described in New York C.P.L.R. § 3012-a, with this Court on June 8, 2020.

**AS AND FOR THE THIRD CAUSE OF ACTION**
**(Bivens Claim Against Defendants Ioannidis, Reid and John Doe Employees of the DHS and DEA for violating Decedent's Fifth Amendment/ Due Process and Eighth Amendment Rights)**

72.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

73.     In late February 2018, Defendants Ioannidis, Reid and other John Doe employees of the DHS and DEA, acted with deliberate indifference to Mr. De La Rosa's serious medical needs, thus violating his due process rights under the Fifth Amendment to the U.S. Constitution as well as his Eighth Amendment rights, when they instigated and facilitated the transportation of

drugs in his intestinal tract, failed to share crucial information with JFK Medical regarding the type and quantity of drugs that Mr. De La Rosa had swallowed, and allowed Mr. De La Rosa to be transferred to the BOP without putting into place any special procedures to ensure that he had safely passed the pellets of narcotics in his intestinal track and/or to ensure that he would be properly medically supervised when he reached the MDC.

74.    These actions and omissions of Defendants Ioannidis, Reid and other John Doe employees of the DHS constituted an objectively serious deprivation of medical care.

75.    Defendant Ioannidis, Reid and the other John Doe employees of the DHS and DEA acted with malicious intent, recklessly and with deliberate indifference because they knew of and disregarded the excessive risk to Mr. De La Rosa's health and safety by orchestrating the operation despite the use of an internal courier, not sharing vital information regarding the quantity of pellets with JFK Medical, BOP, or Mr. De La Rosa, and allowing him to be transferred to the BOP without any special procedures in place.

76.    Defendants Ioannidis and Reid and the other John Doe employees of the DHS and DEA directly participated in this violation of Mr. De La Rosa's Eighth Amendment and Fifth Amendment due process rights, and/or failed to remedy this violation after learning of it through a report, and/or were grossly negligent in supervising subordinates who caused the violation, and/or failed to act on information indicating that this unconstitutional act was occurring.

77.    For these reasons, Plaintiff is entitled to compensatory and punitive damages for this claim.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
**(Bivens Claim Against Defendant Bialor and John Doe Employees of the BOP for violating Decedent's Fifth Amendment/ Due Process and Eighth Amendment Rights)**

78.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

79.     In late February 2018 and early March 2018, Dr. Bruce Bialor, and the John Doe employees of the BOP acted with deliberate indifference to Mr. De La Rosa's serious medical needs, thus violating his due process rights under the Fifth and Eighth Amendments to the U.S. Constitution, when they failed to test for or detect over 30 pellets of heroin in his intestinal tract, and/or failed to transfer Mr. De La Rosa to a medical facility or put into place any special procedures to monitor Mr. De La Rosa so that he could safely pass the pellets.  Dr. Bialor and other John Doe employees of the BOP knew, or should have known, that Mr. De La Rosa had been detained because he had served as an internal drug courier, and therefore, should have examined him and/or x-rayed him upon his arrival at the MDC to ensure that he no longer had any pellets of narcotics in his body.

80.     These actions and omissions of Dr. Bruce Bialor and John Doe employees of the BOP constituted an objectively serious deprivation of medical care.

81.     Dr. Bruce Bialor and the John Doe employees of the BOP acted recklessly and with deliberate indifference because they knew of and disregarded the excessive risk to Mr. De La Rosa's health and safety from the heroin pellets.

82.     Dr. Bruce Bialor and John Doe employees of the BOP directly participated in this violation of Mr. De La Rosa's Fifth Amendment due process rights and Eighth Amendment rights, and/or failed to remedy these violations after learning of it through a report, and/or were grossly

negligent in supervising subordinates who caused the violation, and/or failed to act on information indicating that this unconstitutional act was occurring.

## AS AND FOR THE FIFTH CAUSE OF ACTION
**(Wrongful Death and Medical Malpractice Against JFK Medical, Dr. Manuel Ceja, Dr. B.V. Reddy, Dr. Priyesh Patel, and John Doe employees at JFK Medical)**

83.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

84.    Mr. De La Rosa died on March 3, 2018 as a direct and proximate result of the wrongful and negligent actions and omissions taken by JFK Medical and its employees, including Dr. Ceja, Dr. Reddy and Dr. Patel when they misread Mr. De La Rosa's February 27, 2018 x-ray and February 28, 2018 abdominal radiograph and other radiographs and/or x-rays taken on or around that time, failed to conduct additional x-rays or other internal imaging to ensure that no pellets remained in his system, and discharged him from their facility and deemed him "fit for confinement" while he still had 37 pellets of narcotics in his intestinal tract.

85.    JFK Medical and Dr. Ceja's actions and omissions departed from accepted standards of medical practice, and that departure was the proximate cause of Mr. De La Rosa's death.

86.    These actions and omissions evinced a gross and reckless indifference to Mr. De La Rosa's medical care (equivalent to willful or intentional misdoing), and a conscious and utter disregard for his care and safety, by Dr. Ceja, Dr. Reddy, Dr. Patel and JFK Medical and its employees, contractors and/or agents.  Their conduct was grossly negligent and inappropriate given their actual knowledge of Mr. De La Rosa's condition, and it evinced a high degree of moral culpability and recklessness.

87.     Mr. De La Rosa could have pursued this action against JFK Medical, Dr. Ceja, Dr. Patel and Dr. Reddy if he had not died.  Because he has died, Ms. De La Rosa is pursuing this claim as the administrator of Mr. De La Rosa's estate.

88.     Mr. De La Rosa is survived by his wife and six children who have suffered damages as a result of his death, including, but not limited to: the loss of his future earnings; out-of-pocket funeral expenses; the value of parental support, nurturing, care and guidance to his surviving children; and the value of services that he provided to his family, including but not limited to household repairs and maintenance, and damages otherwise available at law or in equity.  In addition, Mr. De La Rosa's estate is entitled to recover for the conscious pain and suffering that he experienced prior to his death.

89.     Mr. De La Rosa's estate is entitled to recover these damages under New York law, including interest of 9% since March 3, 2018 and punitive damages.

90.     After receiving decedent's records from JFK Medical on March 20, 2020 and April 30, 2020, Plaintiff's counsel filed a certificate of merit, as described in New York C.P.L.R. § 3012-a, with this Court on June 8, 2020.

### AS AND FOR THE SIXTH CAUSE OF ACTION
**(Wrongful Death, Gross Negligence, and Negligence Against JFK Medical and John Doe employees at JFK Medical)**

91.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as if fully stated herein.

92.     JFK Medical and the John Doe employees at JFK Medical owed a duty of care to Mr. De La Rosa when they agreed to monitor him until he safely passed all the drug pellets.  JFK Medical and the John Doe employees at JFK Medical breached the duty of care that they owed when they failed to properly review his x-rays and radiographs and to provide him with the proper

treatment to ensure that all the narcotics pellets had passed from his body.  In addition, they breached their duty of care when then they discharged Mr. De La Rosa and permitted him to relocate to the BOP without ensuring that the pellets had safely passed.

93.    Mr. De La Rosa died on March 3, 2018 as a direct and proximate result of the wrongful and negligent actions and omissions taken by JFK Medical and its employees, contractors and/or agents when they permitted Mr. De La Rosa to leave JFK Medical and discharged him from their care, while he still had 37 pellets of heroin in his intestinal tract.

94.    These actions and omissions were a substantial cause of Mr. De La Rosa's death, and evinced a reckless indifference to Mr. De La Rosa's rights (equivalent to willful or intentional misdoing), and a conscious and utter disregard for his care and safety, by JFK Medical and its employees, contractors and/or agents.  Their conduct was grossly negligent and inappropriate given their actual knowledge of Mr. De La Rosa's condition, and it evinced a high degree of moral culpability and recklessness.  JFK Medical and its employees failed to exercise even slight care in the discharge of the duty that they owed to Mr. De La Rosa.

95.    Mr. De La Rosa could have pursued this action against JFK Medical if he had not died.  Because he has died, Ms. De La Rosa is pursuing this claim as the administrator of Mr. De La Rosa's estate.

96.    Mr. De La Rosa is survived by his wife and six children who have suffered damages as a result of his death, including, but not limited to: the loss of his future earnings; out-of-pocket funeral expenses; the value of parental support, nurturing, care and guidance to his surviving children; and the value of services that he provided to his family, including but not limited to household repairs and maintenance, and damages otherwise available at law or in equity.  In

addition, Mr. De La Rosa's estate is entitled to recover for the conscious pain and suffering that he experienced prior to his death.

97.     Mr. De La Rosa's estate is entitled to recover these damages under New York law, including interest of 9% since March 3, 2018 and punitive damages.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment awarding the following:

a.     Damages in the amount to be determined at trial, available under N.Y. Est. Powers & Trusts Law § 5-4.3 and the Federal Tort Claims Act, 28 U.S.C.A. § 2674, as applicable, from the United States;

b.     Damages in an amount to be determined at trial, plus interest from the date of the decedent's death and punitive damages, under N.Y. Est. Powers & Trusts Law § 5-4.3, from JFK Medical and the John Doe Individuals;

c.     Damages as are otherwise allowable at law or in equity, including punitive damages; and

d.     Such other relief as this Court may deem just and appropriate.

Dated: New York, New York
       July 31, 2020

                                COLSON LAW PLLC

                                /s/ Deborah A. Colson
                                Deborah A. Colson
                                80 Broad Street, 19th Floor
                                New York, N.Y. 10004
                                (212) 257-6455 (main)

                                GELBER & SANTILLO PLLC

                                By: /s/ Kristen M. Santillo
                                    Kristen M. Santillo
                                    R. Zachary Gelber
                                    Fern Mechlowitz
                                    347 West 36th Street, Suite 805
                                    New York, NY 10018
                                    Phone: 212-227-4743
                                    *Attorneys for Plaintiff*