UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

**MARIELA DE LA ROSA**,

Individually and as the Personal Representative and
Administrator of the Estate of Felix Antonio De La Rosa Alvarez,

       Plaintiff,

    -against-

**UNITED STATES OF AMERICA ET AL.**,        <u>NOT FOR PUBLICATION</u>

    Defendants.                       **MEMORANDUM & ORDER**

                                          1:20-cv-01128 (CBA) (MMH)

-------------------------------------------------------x

**AMON, United States District Judge:**

### BACKGROUND

Plaintiff Mariela De La Rosa ("Plaintiff") brought this wrongful death action on behalf of her father, Felix Antonio De La Rosa Alvarez ("Decedent"), against the United States of America, Christopher Reid, Bruce Bialor, Duvinka Jordan, J.F.K. Advanced Medical P.C. ("JFK Medical"), Manuel Ceja ("Ceja"), John Does 1-10, George Ioannidis, Priyesh Patel, B.V. Reddy, and Citimedical I PLLC ("Citimed"). (<u>See</u> ECF Docket Entry ("D.E.") ## 1, 21, 43, 95 ("TAC").) Plaintiff's claims arose out of her father's death while he was in federal custody between February and March 2018. (TAC ¶¶ 88-124.) Plaintiff settled or dismissed her claims against all defendants except JFK Medical, Ceja, and Citimed. (D.E. ## 110 (dismissing claims against Priyesh Patel and B.V. Reddy); 144 (approving settlement with government defendants).)

1

Plaintiff proceeded to a jury trial on her remaining medical-malpractice, wrongful-death claim against three defendants—Ceja, JFK Medical, and Citimed—between October 20 to 27, 2025. (See Minute Entries Dated Oct. 20, 2025; Oct. 27, 2025.) Shortly before the jury was charged, Citimed reached a settlement with Plaintiff. (D.E. # 280 at 40:3-41:14.) On October 27, 2025, the jury returned a verdict in favor of Plaintiff. (D.E. # 246 at 1-4.) The jury awarded the Plaintiff $500,000 for her loss of parental guidance. (Id. at 4.) The jury awarded her three younger siblings, Soanny De La Rosa Padilla, Juan Alexander De La Rosa Santana, and Rachelly De La Rosa—Decedent's biological niece and adoptive daughter—$350,000 each for loss of parental guidance. (Id. at 3.) Jose Antonio Fernandez Capellan, Isandra De La Rosa Encarnacion, and Juan Jose De La Rosa Aybar, her three older siblings, were each awarded $200,000 for loss of parental guidance. (Id. at 4.) The jury further awarded $20,000 in funeral expenses and $3,000,000 in punitive damages. (Id. at 2, 3.) The jury found Decedent was 47% at fault for his own death. (Id. at 2.) The jury found that Decedent's treating physician, Ceja, was acting within the scope of his employment when he treated De La Rosa in February 2018. (Id. at 4.)

I entered judgment in accordance with the jury verdict on January 5, 2026 (D.E. ## 263, 264.) Specifically, I entered judgment—accounting for settlement offsets and the comparative fault finding by the jury—for $964,600.02 in compensatory damages, $674,443.01 in accrued pre-judgment interest, $3,000,000.00 in punitive damages, and post-judgment interest at nine percent per annum. (D.E. # 263 at 9-10.)[1]

---

[1] Defendants filed a notice of appeal as to that judgment. (D.E. # 266.) I have jurisdiction over this case until I dispose of Defendants' post-trial motions herein. (Minute Entry Dated Jan. 15, 2026.) This is so because Federal Rule of Appellate Procedure 4(a)(4)(B)(i) states that "[i]f a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any [Rule 50(b) or Rule 59 motion]—the notice becomes effective to

Before I entered judgment, JFK Medical and Ceja ("Defendants") filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and a motion for a new trial under Federal Rule of Civil Procedure 59(a)(1), both of which are now before me. (See generally D.E. # 257.) For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## DISCUSSION

I assume familiarity with the underlying facts of this case and will discuss the evidence presented at trial as necessary in my analysis. Briefly, Decedent was acting as a drug courier when he traveled to the United States of America from the Dominican Republic on February 23, 2018 after swallowing seventy pellets of heroin. (TAC ¶ 3.) He arrived at New York's John F. Kennedy International Airport, where the Department of Homeland Security detained him and referred him to JFK Medical for treatment until he passed the heroin pellets. (Id.) JFK Medical is a medical clinic in the Airport. It is owned by co-defendant Citimed, who settled with Plaintiff. (D.E. # 263 at 1.)

Decedent received care at JFK Medical for six days, from February 23, 2018 until February 28, 2018, when he was discharged to the United States Bureau of Prisons. (TAC ¶ 5; Trial Transcript ("T.") 135:25-136:2.) While he was under the care of JFK Medical, he was treated by Defendant Ceja, who was its Medical Director. (Id. at 140:4-6.) As stipulated at trial, Decedent excreted thirty-three pellets of heroin while in Ceja's care. (Id. at 136:7-8.) He was discharged from JFK Medical to the Metropolitan Detention Center in Brooklyn, New York, where he died

---

appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered." Fed. R. App. P. 4(a)(4)(B)(i).

on March 2 or 3, 2018 when one of the thirty-seven pellets remaining in his system burst. (Id. at 136:3-6, 231:12-19.)

Plaintiff alleged that Defendants committed medical malpractice by discharging Decedent without first ordering a CT scan, which Plaintiff alleged was required under the standard of care. (Id. at 26:16-19, 30:1-12.) Plaintiff alleged that it was negligent for Ceja to exclusively order x-rays, even after the first x-ray showed no pellets, despite Decedent's admission—and Ceja's knowledge of that admission—that he swallowed anywhere from thirty-three to thirty-five pellets. (Id. at 31.) Plaintiff argued that it was likewise negligent to rely on x-rays showing no pellets even after Decedent passed thirty-three pellets while in Ceja's care. Plaintiff also sought punitive damages on the grounds that Ceja did not believe Decedent, as a detainee, was entitled to the same standard of care as a regular patient and that Ceja's reckless indifference to the Decedent's wellbeing motivated Ceja to release Decedent with a "lethal condition." (Id. at 27:10-22; 978:15-979:10.) The jury awarded approximately $2.5 million dollars in compensatory damages and $3 million in punitive damages. (D.E. # 246.)

Defendants Ceja and JFK Medical now seek to challenge that award in their motion for a renewed judgment as a matter of law ("JMOL") under Rule 50 and, alternatively, for a new trial under Rule 59.

## I.    LEGAL STANDARD

### A.  Rule 50(b) Standard

If a litigant believes that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the other side on an issue "fully heard" at trial, they may move for judgment as a matter of law during trial under Federal Rule of Civil Procedure 50(a) and renew the motion

4

after trial under Rule 50(b). Fed. R. Civ. P. 50(a)-(b). In deciding a Rule 50(b) motion, I can: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). "If the Rule 50(a) motion is not granted <u>before</u> the matter is submitted to the jury, and the jury finds against the movant, the movant may renew its motion after trial under Rule 50(b) as a motion for [JMOL]." <u>Edelman v. NYU Langone Health Sys.</u>, 141 F.4th 28, 41 (2d Cir. 2025).[2]

A Rule 50 renewed motion for JMOL "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." <u>Connelly v. Cnty. of Rockland</u>, 61 F.4th 322, 325 (2d Cir. 2023) (citation and quotation marks omitted); <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 133 (2d Cir. 2008) ("[E]vidence in favor of the movant [must be] so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it."). In making these determinations, I "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence" on my own. <u>Brady</u>, 531 F.3d at 133 (quotation marks omitted). Rather, I must consider "the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." <u>Wolf v. Yamin</u>, 295 F.3d 303, 308 (2d Cir. 2002) (citation omitted). I also "disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Olsen v. Stark Homes, Inc.</u>, 759 F.3d 140, 153 (2d Cir. 2014) (citation and quotation marks omitted). "The movant's burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict." <u>Triolo v. Nassau Cnty.</u>, 24 F.4th 98, 105 (2d Cir. 2022) (citation and quotation marks omitted). "The standard for

---

[2] What is currently referred to as a renewed JMOL in the Federal Rules was historically called a "judgment notwithstanding the verdict" or JNOV. <u>See</u> <u>Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998). For consistency and simplicity, I alter quotations from caselaw to reflect the new terminology.

5

granting [such] a motion . . . is appropriately strict." Stubbs v. Dudley, 849 F.2d 83, 85 (2d Cir. 1988).

### B. Rule 59 Standard

In the alternative, a litigant may move for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A).[3] I can grant a new trial if I am "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 324 (2d Cir. 2022) (citation and quotation marks omitted). This standard is "less stringent" than the standard governing Rule 50 motions, and I can weigh the evidence and need not view it in the light most favorable to the non-movant. Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003).

A motion for a new trial based on excessive damages is cognizable under this rule. See, e.g., Tretola v. Cnty. of Nassau, 14 F. Supp. 3d 58, 80 (E.D.N.Y. 2014). If I conclude that a jury verdict is excessive, I may either "order[ ] a new trial without qualification" or order a new trial "conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996)); see also Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995).

I can exercise my "authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken' and '(2) more generally, where the award is "intrinsically excessive" in

---

[3] Federal Rule of Civil Procedure 50(c) requires that, if I grant the 50(b) motion, I also conditionally rule on the Rule 59 motion. Fed. R. Civ. P. 50(c).

the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'" Small v. City of New York, No. 09-CV-1912 (RA), 2022 WL 1261739, at *13 (S.D.N.Y. Apr. 28, 2022) (quoting Trademark Rsch. Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993)).

A federal court with diversity jurisdiction over a case governed by state law must apply the state law standard for reviewing the size of jury awards. Gasperini, 518 U.S. at 429-30. New York Civil Practice Law and Rules § 5501(c) provides generally that damages awards are excessive or inadequate if they "deviate[ ] materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c); see also Payne v. Jones, 711 F.3d 85, 97 n.8 (2d Cir. 2013). "To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases." Stampf v. Long Island R.R. Co., 761 F.3d 192, 204 (2d Cir. 2014). "The relevant standard 'is not whether an award deviates at all from past awards—it is whether an award deviates materially from reasonable compensation.'" Carroll v. Trump, 151 F.4th 50, 80 (2d Cir. 2025) (quoting Stampf, 761 F.3d at 204).

## II.   ANALYSIS

### A. Defendants Are Not Entitled to a Directed Verdict on Causation

"In a medical malpractice action, as in any negligence action, the plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant's negligence, in this case the departure from good and accepted medical practice, proximately caused the injury claimed." Mortensen v. Mem'l Hosp., 483 N.Y.S.2d 264, 270 (App. Div. 1984). In their Rule 50(b) motion, Defendants argue that Plaintiff failed to establish that their negligence proximately caused Decedent's death, entitling them to a directed verdict. (D.E. # 257-1 at 28-31.) They argue that Plaintiff's evidence that Defendants proximately caused Decedent's death was

7

insufficient to permit a reasonable juror to find in Plaintiff's favor, entitling them to a judgment as a matter of law. (Id.)[4]

Defendants challenge Plaintiff's theory of causation: that had Decedent remained in Defendants' care rather than being released to prison, medical staff would have caught the pellet rupture and reversed its effects or prevented the rupture in the first place by manually removing the pellets Decedent failed to expel naturally. Defendants countered with the theory that Decedent would have died regardless of his location because of the lethality of the dose of heroin in a single pellet and because of his preexisting conditions. (See id. at 30-31; T. 614:19-615:9.)

I denied Defendant's motion at trial and do so again here. (T. 626:17-18.) I found that Dr. Traub's opinion that Decedent would have survived had he remained in Defendants' care constituted evidence of causation that the jury could weigh in its deliberations. (Id. at 626:19-24.) I review the evidence presented at trial below and conclude that it cannot be said "the evidence in favor of [Defendants] is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against [them]." Brady, 531 F.3d at 133 (citations omitted).

Defendants now argue that Plaintiff failed to prove causation in two ways. First, they claim that Plaintiff's expert witness, Dr. Stephen Traub—for the first time at trial and in contrast to conclusions in Traub's own research—testified that an endoscopy could have been used to retrieve any pellets that he did not pass naturally. (D.E. # 257-1 at 29-30.) Second, Defendants claim that Traub failed to rebut the opinion of their expert witness, Dr. Anna Kogan, that the

---

[4] Defendants do not appear to make a Rule 59 motion for a new trial with respect to the issue of causation. Nonetheless, upon review of the jury's verdict under the more lenient "against-the-weight-of-the-evidence" standard of Rule 59, for the reasons set forth in my Rule 50(b) analysis, I find no error in the verdict as to causation that warrants granting a new trial.

administration of Naloxone would not have reversed the lethality of a burst pellet and saved Decedent's life. (Id. at 30-31.)

There was ample evidence presented to the jury to support the conclusion, which the jury eventually reached, that Defendants' negligence proximately caused Decedent's death. Traub primarily testified to his opinion that Decedent's life could have been saved had he remained in the care of JFK Medical, not to the role of endoscopy as a lifesaving technique for body packers. The jury heard that JFK Medical had a protocol in place to provide bag-and-mask ventilation if a patient's breathing stopped due to a ruptured pellet and to transport that patient to a hospital for more advanced care. (T. 359:14-361:21, 365:15-25.)

To the extent that Defendants complain they were disadvantaged because Traub opined for the first time at trial that endoscopy could be used to extract pellets, (id. at 365:1-14), Defendants were able to address this claim. They extensively challenged Traub's conclusions to that effect. On cross examination, Defense counsel elicited Traub's inconsistent opinions at trial and in his report with respect to the efficacy of endoscopy in extracting pellets. (Id. at 448:5-455:24). Traub answered for this inconsistency by testifying that his research cited by Defense counsel concerned the efficacy of endoscopy for extracting cocaine pellets, not heroin pellets, which pose less risk upon rupture in an endoscopy suite. (Id. at 453:21-454:13, 473:9-20.) Defendants elicited the fact that Traub had never before expressed this opinion about endoscopy. (Id. at 448:5-455:24.)

Moreover, Defendants were able to offer rebuttal testimony on endoscopies. Dr. George DeNoto opined that endoscopy for body-packing patients "is very dangerous" because of how easily drug pellets can rupture. (Id. at 654:19-656:6, 656:22-657:19, 672:6-20.) He testified that an endoscopy would be contraindicated in this case because of the number of pellets in

9

Decedent's body. (Id. at 672:21-23.) "Whatever the competing views of the . . . health practitioners, it is solely for the jury to weigh and assess the credibility of dueling experts." Katt v. City of New York, 151 F. Supp. 2d 313, 351 (S.D.N.Y. 2001) (Lynch, J.), aff'd in part sub nom. Krohn v. New York City Police Dep't, 60 F. App'x 357 (2d Cir. 2003), and aff'd sub nom. Krohn v. New York City Police Dep't, 372 F.3d 83 (2d Cir. 2004).

As to Defendants' second argument, the parties likewise presented experts with competing views. Traub testified that Naloxone administration could have resuscitated Decedent when he first experienced heroin toxicity. (T. 362:6-15; 364:19-25; 365:15-25.) This directly contradicted Kogan's testimony that Naloxone would not have saved his life. (Id. at 684:1-18.) As a rebuttal witness, Traub squarely refuted Kogan's testimony that Decedent's health conditions, diabetes, coronary artery blockages, and high blood pressure made him a "ticking time bomb." (Id. at 366:12-367:18.)

Resolution of dueling expert testimony about JFK Medical's capacity to save Decedent's life had the heroin pellet burst in their care is precisely the sort of credibility-driven issue properly resolved by the jury, whose determinations the Court will not second-guess. See ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014) (on a Rule 50 motion "'[t]he Court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses or substitute its judgment for that of the jury'" (quoting Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001))).

## B. Compensatory Damages

### 1. Remittitur Is Appropriate for Some of the Loss-of-Parental-Guidance Awards to Adult Children

New York law provides recovery in wrongful death actions "'for the loss of the nurture, care and guidance decedents would provide their children had death not intervened.'" See Collado v. City of New York, 396 F. Supp. 3d 265, 281 (S.D.N.Y. 2019) (Chin, J.) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 52 (2d Cir. 1984)). The award must equal the pecuniary value of that nurture, care, and guidance the children lost. McKee v. Colt Elecs. Co., 849 F.2d 46, 50 (2d Cir. 1988).

New York courts and federal courts applying New York law consistently acknowledge adult children's right to recover for the loss of parental guidance. Indeed, many courts have recognized "'the realities of an increasingly complex society where children rely more heavily, and for a greater number of years, on the guidance of their parents.'" Dershowitz v. United States, No. 12-CV-08634 (SN), 2015 WL 1573321, at *37 (S.D.N.Y. Apr. 8, 2015) (citing McKee, 849 F.2d at 52 and Gonzalez v. New York City Hous. Auth., 77 N.Y.2d 663, 668-69 (1991)); Gonzalez, 77 N.Y.2d at 668 ("[P]laintiffs' status as adult financially independent grandchildren does not, of itself, preclude their recovery.").

New York also "recognize[s] that pecuniary advantage results as well from parental nurture and care, from physical, moral and intellectual training, and that the loss of those benefits may be considered within the calculation of 'pecuniary injury.'" Ramirez v. Chip Masters, Inc., No. 11-CV-5772 (WFK) (MDG), 2014 WL 1248043, at *11 (E.D.N.Y. Mar. 25, 2014) (citing Zygmunt v. Berkowitz, 754 N.Y.S.2d 313, 314 (App. Div. 2003)). Decedent need not have been a "wage earner" for his adult children to recover damages. Gonzalez, 77 N.Y.2d at 668.

11

Defendants move for remittitur or a new trial on the loss-of-parental-guidance damages awarded to Decedent's adult children: Plaintiff, Mariela De La Rosa, (awarded $500,000), Juan De La Rosa Aybar (awarded $200,000), Jose Fernandez Capellan (awarded $200,000), and Isandra De La Rosa (awarded $200,000). (D.E. # 257-1 at 15-25.)[5] Defendants argue that the awards are excessive and unsupported by "law and fact" because (1) the children were financially independent adults and (2) the jury rejected Plaintiff's claim for lost earnings, indicating the jury's view that he had "zero earning potential" with which he could have supported his children had he lived. (Id. at 15-16.)

### a. Compensability

The adult children were entitled to recover loss-of-parental-guidance damages. There was ample, unrefuted testimony that Decedent provided each of his children with "care, love, and guidance." See Ramirez, 2014 WL 1248043, at *11. Plaintiff Mariela De La Rosa, who was twenty-five when her father died, described a close relationship with her father. Even though she lived in the United States, she saw her father nearly three times per year, usually for a month or two at a time. (T. 60:6-17.) They maintained near constant contact via video calls. (Id. at 60:18-22, 164:16-166:4.) He was present for her at difficult times, including when she discovered she was pregnant at a young age, at which point her father flew to the United States the next day to support her. (Id. at 98:25-99:11.) Likewise, he counseled her when she made big decisions, such as purchasing her first car. (Id. at 99:14-20.) He sent her anywhere from $200 to $400 per month to help her with expenses. (Id. at 79:1-8.)[6]

---

[5] Defendants do not challenge the jury's award to Decedent's biological children who were minors at the time of his death, Soanny De La Rosa Padilla and Juan Alexander De La Rosa Santana, who received $350,000 each for loss of parental guidance. (D.E. # 246 at 3.) Defendants challenge Rachelly De La Rosa's—Decedent's biological niece and adoptive daughter—entitlement as a matter of law to recover for loss of parental guidance. I address that challenge infra Section II.B.2.

[6] Although the jury did not award Plaintiff any damages for lost earnings, past or future, I nonetheless highlight testimony about Decedent's financial support of his children—undocumented and seemingly sporadic—to illustrate

The jury also heard how Plaintiff struggled to fill Decedent's role after his death. Plaintiff took custody of her younger brother, Juan Alexander, (id. at 81:20-22), and had to rent a larger apartment to accommodate him, (id. at 89:15-19). She took over her father's role supporting his wife and youngest daughter by sending money to them in the Dominican Republic every month. (Id. at 89:20-25.) Plaintiff borrowed money to pay her family's electricity bill after it had been shut off and applied for food stamps to make up for the loss of her father's financial support. (Id. at 607:23-608:4.)

As for Plaintiff's adult siblings, the jury heard sufficient evidence to support their claim for the loss of "parental nurture and care" and "physical, moral and intellectual training" they would have received if their father lived. See Zygmunt, 754 N.Y.S.2d at 314 (citation and quotation marks omitted). Jose Fernandez Capellan was thirty-six years old when his father died. (Id. at 484:4.) Jose testified that his father was his "superhero," whom he saw everyday as an adult. (Id. at 486:20-24.) They went to movies and wrestling matches together. (Id. at 499:10-11.) Decedent taught Jose to swim. (Id. at 499:13.) Decedent also paid Jose's and his daughter's school fees. (Id. at 499:19-20.) Jose worked with his father to run a music business that organized concerts before Decedent's death. (Id. at 488:1-15.) Jose also testified directly that his father gave him encouragement through times of sadness and low energy. (Id. at 503:14-17.)

Testimony at trial with respect to Isandra De La Rosa ("Isandra") and Juan De La Rosa Aybar ("Juan") was sparser, but it nonetheless confirmed their entitlement to compensation for loss of parental guidance. Isandra was thirty-two years old when her father died. (D.E. # 257-1 at 23.) Juan was twenty-nine. (Id. at 22.) Isandra and her father saw each other at least once per week, doing various recreational activities together. (T. 528:11-17.) Her father often took Isandra

---

the quality of the relationship he had with them, rather than to calculate an appropriate amount of damages for loss of parental guidance.

shopping and encouraged her interest in painting. (Id. at 64:21-25.) Decedent took her to the doctor when she was pregnant and paid her college tuition and medical bills. (Id. at 528:17-22.) Decedent financially supported Juan as well. (Id. at 79:18-19.) Juan was incarcerated before Decedent's death and Decedent visited him in jail at that time. (Id. at 111:8-16.) Plaintiff testified that her father would have continued to provide support and guidance to all his children by calling them from prison had he survived. (Id. at 153:18-21.)

The evidence adduced at trial demonstrates that Decedent's relationships with his children centered primarily around the emotional—more so than financial—support that he provided them, although there was testimony that Decedent economically contributed to his children's households. (See, e.g., 78:22-79:19, 89:20-25, 499:19-21, 528:17-22, 607:23-608:4.) It is not critical to weigh this evidence of his financial support—as Defendants suggest—because New York law makes clear that "losses of a personal nature, such as loss of guidance" are compensable. Gonzalez, 77 N.Y.2d at 668. Contrary to Defendants' argument, (see, e.g., D.E. # 257-1 at 22-23), it ultimately does not matter that the jury awarded nothing for Decedent's lost earnings or that Decedent's earning potential would have been curbed by his forthcoming imprisonment, (see T. 931:5-13). There was ample evidence that the children's lives were "greatly enhanced by the training, education, and guidance that they already received from their [father]." Dershowitz, 2015 WL 1573321, at *38. Compensation for the loss of the training, education, and guidance they would have continued to receive but for their father's death was thus warranted.

### b. Amount of Damages

Turning to the question of how much compensation is warranted, it is important to note at the outset that courts are usually hesitant to revise a jury verdict on loss-of-parental-guidance

damages because "[c]ourts recognize that pecuniary damages resulting from death usually lack direct evidence," and calculation of such damages "is therefore left to the jury." Collado, 396 F. Supp. 3d 26 at 280; McKee, 849 F.2d at 52 ("'[C]alculation of pecuniary loss is a matter resting squarely within the province of the jury.'" (quoting Parilis v. Feinstein, 49 N.Y.2d 984, 985 (1980))); Richardson v. Lutheran Hosp. of Brooklyn, 417 N.Y.S.2d 526, 527 (App. Div. 1979) (noting that care, love, and guidance "are intangible factors which should be evaluated by a jury," not the court). Nonetheless, reduction of jury awards is appropriate when they deviate materially from reasonable compensation. N.Y. C.P.L.R. § 5501(c). Giving deference to the jury's calculations and after reviewing awards in comparable cases, I conclude that the awards to Plaintiff Mariela, Isandra, and Juan deviate materially from reasonable compensation. I let stand the award to Jose.

The highest awards—usually more than $1,000,000 per child—have been reserved for children who lost their parents at a young age.[7] See, e.g., Phelan v. State, 804 N.Y.S.2d 886, 890, 901-902 (Ct. Cl. 2005) (awarding, after bench trial, $1,100,000 ($1,833,081) per child, both under twelve); Ramirez, 2014 WL 1248043, at *11 (awarding damages on default motion to $1,000,000 ($1,371,695) for infant); Vasquez v. Cnty. of Nassau, 938 N.Y.S.2d 109, 111, 114 (App. Div. 2012) (affirming $700,000 ($1,000,972) for infant with special needs); Adderley v. City of New York, 757 N.Y.S.2d 735, 736 (App. Div. 2003) (affirming $1,000,000 award ($1,763,449) for infant); Paccione v. Greenberg, 682 N.Y.S.2d 442, 443-44 (App. Div. 1998)

---

[7] "It is appropriate to consider inflation when comparing prior jury verdicts and remittitur orders." Jackson v. Tellado, No. 11-CV-3028 (PKC) (SMG), 2018 WL 4043150, at *4 n.4 (E.D.N.Y. Aug. 24, 2018) (using United States Bureau of Labor Statistics calculator found at http://data.bls.gov/cgi-bin/cpicalc.pl for adjustment purposes) (citations omitted); see also, e.g., Palmer v. Molina Meneses, No. 12-CV-4741 (RER), 2016 WL 7191668, at *2 n.1 (E.D.N.Y. Dec. 12, 2016) (adjusting award "from the year in which the verdict was entered, or the appeal concluded"). Here, I indicate in the internal parentheticals that I have adjusted verdicts for inflation as of November 2025, the first month for which the Bureau of Labor Statistics has statistics after the verdict in this case was reached in late October 2025.

(reducing damages from $2,500,000 to $1,500,000 ($2,966,339) for each child, all of whom were under seven); Carlson v. Porter, 861 N.Y.S.2d 907, 911 (App. Div. 2008) (children's award was remitted to $1,000,000 ($1,473,523) each for combined future and past loss of parental guidance when children were under ten). But see Gardner v. State, 24 N.Y.S.3d 805, 808 (App. Div. 2015) (declining to disturb award, which totaled $437,500 ($599,528) each for two teenagers).[8] "[C]ourts reviewing jury awards for loss of parental guidance have generally reduced awards to adult children to a fraction of the amount recoverable by infant children." Mono v. Peter Pan Bus Lines, Inc., 13 F. Supp. 2d 471, 477 (S.D.N.Y. 1998) (collecting cases).

Despite testimony as to the significant "degree of dependency" the distributees here had on Decedent, McKee, 849 F.2d at 52 (citation omitted), Plaintiff's, Isandra's, and Juan's awards for loss of parental guidance are materially higher than those typically upheld or awarded to adult distributees. Indeed, most awards under like factual circumstances hover between $100,000 and $350,000. See Gonzalez, 77 N.Y.2d at 665-66, 670-71 (affirming an award of $100,000 total ($239,735) to two adult grandchildren whose parent-like grandmother regularly prepared meals, provided temporary shelter, and counsel); Mono, 13 F. Supp. 2d at 478 (reducing award from $240,000 to $75,000 ($148,953) for twenty-nine year old living far away with successful career who nonetheless relied heavily on decedent for guidance navigating personality disorder and learning disability); Ramos v. La Montana Moving & Storage, Inc., 669 N.Y.S.2d 529, 530 (App. Div. 1998) (reducing award to $150,000 ($300,298) total for three adult children where decedent babysat regularly, counseled children, and provided emergency financial assistance to

---

[8] There are many cases awarding or upholding similarly large verdicts that do not specify the age of the children nor other facts critical to making a useful comparison. See, e.g., Bogen v. State, 772 N.Y.S.2d 869, 869 (App. Div. 2004) (affirming $1,250,000 award ($1,715,883)); Garcia v. New York City Health & Hosps. Corp., 646 N.Y.S.2d 694, 695 (App. Div. 1996) (reducing award to from $1,000,000 to $750,000 ($1,545,401) and from $1,500,000 to $850,000 ($1,751,454) for two children upon death of their stay-at-home mother); Grevelding v. State, 17 N.Y.S.3d 813, 815-16 (App. Div. 2015) (decreasing award for one child from $2,000,000 to $1,400,000 ($1,907,899) and for another from $2,200,000 to $1,500,000 ($2,044,177)).

16

one child); Moldawsky v. Simmons Airlines, Inc., 14 F. Supp. 2d 533, 534-35 (S.D.N.Y. 1998) (reducing award from $200,000 to $100,000 ($198,118) for daughter who was twenty at time of father's death, but was obtaining masters degree and "doing very well"); Bacchus-Sirju v. Hollis Women's Ctr., 152 N.Y.S.3d 480, 483, 485 (App. Div. 2021) (reducing loss-of-parental-guidance damages from $500,000 to $250,000 ($296,811) and from $500,000 to $100,000 ($118,725), for an adult daughter and son, respectively); McHugh v. New York City Transit Auth., 943 N.Y.S.2d 891, 891 (App. Div. 2012) (affirming $497,664 ($701,886) for two adult sons, including one who lived out of state but visited and spoke with decedent frequently and received payment of student loans from her); Hyung Kee Lee v. New York Hosp. Queens, 987 N.Y.S.2d 436, 439, 441-42 (App. Div. 2014) (decreasing award from $336,000 to $250,000 ($339,974) representing guidance and care for thirty-two year old daughter with severe mental health issues that rendered her dependent on her parents).[9] In comparison to these cases, Plaintiff's $500,000 award and Isandra and Juan's $200,000 awards materially deviate from what would be reasonable compensation.

### i.      Plaintiff Mariela De La Rosa

The high end of the awards courts typically grant or affirm for adult children is $350,000. Plaintiff resembles the adult children-claimants who were deeply dependent on their parents for

---

[9] I note briefly that the low end of awards to adult claimants tends to emerge in cases where judges conducted a bench trial and were not bound by deference to a jury's verdict as I am now. See Dershowitz, 2015 WL 1573321, at *1, 14-15, 37-38 (granting $25,000 ($34,248 per claimant) to children in their forties who spoke regularly with their mother and sought her advice, but did not live with her nor receive meals or childcare from her); Coolidge v. United States, No. 10-CV-363S, 2020 WL 3467423, at *40 (W.D.N.Y. June 25, 2020), amended in part, No. 10-CV-363S, 2021 WL 1206514 (W.D.N.Y. Mar. 31, 2021) (four children "in middle age" who received minimal financial support from decedent and had "strained or nearly severed relationships" with him could recover $3,000 ($3,771) each in damages); Mann v. United States, 300 F. Supp. 3d 411, 421 (N.D.N.Y. 2018) (awarding $25,000 ($32,691) for adult children ages twenty-eight to thirty-three who received "some financial help, . . . as well as advice, guidance, and other compensable services."). Bearing in mind that a jury's personal-injury award is "entitled to great deference," Ortiz v. 975 LLC, 901 N.Y.S.2d 839, 839 (2010), I decline to decrease the awards here to the extent that these cases do.

care and emotional support and were ultimately awarded roughly $350,000, e.g., McHugh, 943 N.Y.S.2d at 891 and Hyung Kee Lee, 987 N.Y.S.2d at 439, 441-42. I reduce Plaintiff's loss-of-parental-guidance award to $350,000 to conform with compensation courts have found reasonable for adult children who, like Plaintiff, were heavily reliant on their parent's guidance.

### ii.      Isandra and Juan De La Rosa

I also reduce Isandra and Juan's $200,000 awards. The testimony at trial failed to establish that the Decedent had the same exceptionally close relationship with these two adult children as he had with Plaintiff and Jose. There was no testimony that Isandra and Juan relied on their father for guidance or emotional support. Moreover, the testimony that they received his financial support failed to specify how frequent or significant that support was, and whether it continued after Isandra's pregnancy or university studies to the time leading up to Decedent's death. (T. 79:18-19; 528:17-22.) Decedent's relationship with Juan prior to Decedent's death consisted of visiting Juan in prison. (Id. at 528:12-17.) Both children were older—in their late twenties or early thirties—when Decedent died. (D.E. # 257-1 at 22-23.) Isandra and Juan more closely resemble the claimants who received lower loss-of-parental-guidance awards like the grandchildren in Gonzalez and the children in Ramos. Their awards are reduced to $100,000 each.

### iii.     Jose De La Rosa

By contrast, I decline to disturb Jose De La Rosa's $200,000 award, largely because of the extensive and detailed testimony presented at trial as to their extraordinarily tight bond. At the time of Decedent's death, he resided near his father, saw him frequently, depended on his father for financial assistance and advice, and worked professionally with him. (See generally supra

Section II.B.1.a.) According to his testimony at trial, Jose depended on his father in almost every aspect of his life. This award does not materially deviate from reasonable compensation.

Accordingly, Defendants' motion for a new trial concerning loss-of-parental-guidance damages for Plaintiff, Isandra, and Juan will be granted unless Plaintiff agrees to a remittitur reducing the loss-of-parental-guidance damages award from $500,000 to $350,000 for Plaintiff, $200,000 to $100,000 each for Isandra and Juan.

**2.  Rachelly De La Rosa Is Entitled to Recover Damages**

Defendants contend that Rachelly De La Rosa ("Rachelly"), the Decedent's minor niece and adoptive daughter, was not entitled to recover wrongful death damages because she was only equitably, not formally, adopted by Decedent, and was therefore not his "distribute" as required by New York law. (D.E. # 257-1 at 26-28.)

New York Estates, Powers and Trusts Law ("N.Y. E.P.T.L.") § 5-4.4 limits recovery in wrongful death actions to the "decedent's distributees." N.Y. E.P.T.L. § 4-1.1 and § 1-2.10 in turn define "distributees" as "spouse and issue," including "adopted children."

I have already considered Defendants' arguments on this point and found on the record that reasonable and fair-minded jurors could have found that Rachelly was entitled to recover for loss of parental guidance. (See, e.g., T. 521:23-522:2, 616:23-617:2.) In the interest of thoroughness, I briefly repeat those findings and decline to disturb them under either the Rule 50 or 59 standard.

In New York, the doctrine of equitable adoption "essentially aims to confer the rights and privileges of a natural born child upon a purported adopted child provided certain elements are satisfied." Bojanovich v. Woitach, 972 N.Y.S.2d 142, at *4 (Sup. Ct. 2013). Specifically, "[a]n oral agreement to adopt, where there has been a full and faithful performance on the part of the

19

adoptive child, but which was never consummated by formal adoption proceedings during the life of the adoptive parent" can be enforced such that the adoptee "occupies in equity the status of an adopted child, entitled to the same right of inheritance" as a biological child. Est. of Riggs, 440 N.Y.S.2d 450, 451 (Sur. 1981); see also Matter of Fairhurst, 988 N.Y.S.2d 522, 522 ( Sur. 2014) ("The doctrine of equitable adoption is applied for the benefit of the child."). By these measures, there was sufficient evidence that Decedent equitably adopted Rachelly such that she can recover wrongful death damages as if she were his biological child.

As adduced at trial, Rachelly was the child of Decedent's sister. (T. 62:1-2.) Rachelly began living with Decedent when she was two months old, because her mother suffered from mental illness that prevented her from taking care of her daughter. (Id. at 61:21-62:7.) She lived with Decedent until his death. (Id. at 113:14-21.) Decedent was in the process of formally adopting his niece when he died. (Id. at 104:15-22).  He and his wife, Mauritza Vasquez, met with the Dominican Republic's adoption office, CONANI, and received a list of tasks they needed to complete to adopt Rachelly. (Id. at 62:8-15.) One task included legally marrying, which Decedent and Vasquez did in the interest of completing Rachelly's adoption. (Id.) They also received permission from Rachelly's biological mother to adopt the girl. (Id. at 524:8-11.) Rachelly was "four or five" when Decedent died, and she continues to live with Vasquez. (Id. at 70:3-6; 525:19-23.) These facts constitute a "legally sufficient evidentiary basis" to support Rachelly's recovery of loss-of-parental-guidance damages as Decedent's equitably adopted daughter.

Defendant's reliance on Martel v. Southampton Hospital is misplaced. 38 N.Y.S.3d 622 (App. Div. 2016). There, the decedent took "[n]o steps . . . in furtherance of an adoption procedure because [the claimant stepdaughter] did not want to be adopted." Martel v. Southampton Hosp.,

No. 07-24175, 2013 WL 6579707, at *17 (Sup. Ct. Nov. 29, 2013). As such there was no argument to be made that the decedent's stepdaughter had been equitably adopted. By contrast here, the jury heard extensively about how Decedent took legal steps, including marriage, to adopt Rachelly. Decedent received permission from Rachelly's mother to adopt her. Rachelly uses Decedent's last name and continues to reside with his spouse even after his death. At least one court in this Circuit applying New York law has concluded that claimants who were not formally adopted but resided with the decedent, were considered by him to be his children, and took his last name were "issue" for the purposes of the E.P.T.L. Benton v. Brookfield Props. Corp., No. 02-CIV-6862 (JFK), 2004 WL 1335908, at *9 (S.D.N.Y. June 14, 2004). Indeed, the evidence here shows that Decedent made a more concerted effort to formally adopt Rachelly than the decedent apparently did in Benton.

There was sufficient evidence to permit a reasonable juror to find in Rachelly's favor. Nor can it be said that the jury reached a seriously erroneous result or one that constitutes a miscarriage of justice by granting Rachelly damages. Thus, I reiterate my denial of Defendant's Rule 50 motion and likewise deny a new trial under Rule 59 as to Rachelly's entitlement to compensatory damages.

Defendants do not challenge the amount of loss-of-parental-guidance damages that Rachelly was awarded. Nonetheless, I note briefly that the award of $350,000 is well within what New York courts consider reasonable compensation for loss of parental guidance for a child, like her, who was no more than five when her parent died and completely dependent on him. (See supra Section II.B.1.b (collecting New York cases consistently awarding or upholding awards for young children over $1,000,000 in loss-of-parental-guidance damages).)

### 3. Funeral Expenses Should Be Reduced

Defendants request that I decrease the compensatory damages award for funeral expenses to conform to the evidence at trial. (D.E. # 257-1 at 15 n.4.) Their motion is based on the discrepancy between the expenses that Plaintiff testified she paid in funeral expenses for her father, $9,000, and the amount the jury awarded her for funeral expenses, $20,000. (Compare T. 97:1-9 with D.E. # 246 at 3.) Plaintiff does not respond to this contention in her brief.

The jury's award with respect to funeral expenses was "'against the weight of the evidence,'" and reduction is appropriate because I "'can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken.'" Frank Sloup & Crabs Unlimited, LLC v. Loeffler, 745 F. Supp. 2d 115, 132 (E.D.N.Y. 2010) (Bianco, J.) (quoting Kirsch, 148 F.3d at 165). Under similar circumstances, courts in this circuit have reduced funeral-expenses awards to align with the evidence of those expenses submitted at trial. Cf. Collado, 396 F. Supp. 3d at 281. As such, I grant Defendants' motion with respect to funeral damages and reduce the funeral-expenses damage award from $20,000 to $9,000.

### C. The Punitive Damages Award Should Be Reduced, Not Vacated

The jury awarded Plaintiff $3,000,000 in punitive damages. Defendants seek vacatur of this award as a matter of law. For the reasons stated below, I deny Defendant's Rule 50(b) motion, but I grant remittitur and reduce the punitive damages to $1,500,000.

### 1. Compensability

The standard for an award of punitive damages in New York is "aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." Dupree v. Giugliano, 20 N.Y.3d 921, 924 (2012) (internal quotations and citations

omitted). Defendants claim that the issue of punitive damages should not have been submitted to the jury because punitive damages are appropriate only when a defendant's actions "'manifest evil or malicious conduct beyond any breach of professional duty.'" (D.E. 257-1 at 6 (quoting Dupree, 20 N.Y.3d at 924.)) Defendants claim that Ceja's decision to discharge Decedent without seeking a CT scan did not manifest the requisite "wanton or . . . reckless disregard for human life." (See, e.g., D.E. # 257-1 at 10.) Plaintiff counters that there was sufficient evidence to submit the question of whether she was entitled to punitive damages to the jury. (D.E. # 259 at 2.) Plaintiff argues that Ceja's decision to release Decedent with a potentially fatal condition based on x-rays that had already proved unreliable—and in light of Ceja's comments expressing doubt about detainee's entitlement to the standard of care—constituted "utter disregard for the safety of others." (Id.)

As I held on the record, the evidence supported charging punitive damages because a jury could have found that Ceja was wantonly reckless by discharging Decedent when he knew or should have known that Decedent had lethal heroin pellets still in his system and by relying on x-rays, even though he knew that prior x-rays had incorrectly shown the absence of the pellets. (T. 965:5-11.) In situations like this one, New York law instructs that "the issue of punitive damages need not be taken away from the jury simply because conflicting inferences may be drawn regarding the blameworthiness of the defendant's conduct." Randi A.J. v. Long Island Surgi-Ctr., 842 N.Y.S.2d 558, 566 (App. Div. 2007) (citations omitted).

Indeed, courts in this state have found a question of fact for the jury to decide as to whether the negligent failure to provide necessary testing, care, or examinations in the face of a patient's potentially emergent condition constituted a "wanton, intentional, reckless . . . departure from accepted medical practice." Sultan v. Kings Highway Hosp. Ctr., Inc., 562 N.Y.S.2d 204, 205

23

(App. Div. 1990) (permitting vicarious-liability punitive damages issue to proceed to jury where emergency room nurse turned away decedent suffering an acute cardiac event without providing treatment of examination by doctor); see also, e.g., Melvin v. Cnty. of Westchester, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *1-2, 24 (S.D.N.Y. Mar. 29, 2016) (allowing plaintiff to seek punitive damages where jail medical staff failed to use a heart monitor on patient, negligently instructed the provision of indigestion medication, and failed to bring decedent to a medical facility upon signs of a heart attack); Marsh v. Arnot Ogden Med. Ctr., 937 N.Y.S.2d 383, 385-87 (2012) (allowing punitive damages issue to proceed to jury where nurse gave diabetic insulin and doctor knew of dangerously low glucose levels but discontinued glucose testing and failed to return to the hospital to examine the patient despite medical emergency); Deane v. Mount Sinai Hosp., 901 N.Y.S.2d 898, at *5-11 (Sup. Ct. 2009) (same where patient wasn't evaluated by an attending physician for two days and missing attending physician wasn't notified that he was needed at hospital); Graham v. Columbia-Presbyterian Med. Ctr., 588 N.Y.S.2d 2, 3 (App. Div. 1992) (same regarding doctor's decision to leave the hospital without identifying patient's source of bleeding); Colombini v. Westchester Cnty. Healthcare Corp., 808 N.Y.S.2d 705, 708-709 (2005); Mitchell v. Handler, No. 7031/99, 2001 WL 914221 (N.Y. Sup. Ct. June 25, 2001); Bollino v. Hitzig, No. 22913/99, 2001 WL 1729706 (N.Y. Sup. Ct. Dec. 7, 2001).[10]

Whether I consider "the evidence in a light most favorable to" Plaintiff under Rule 50 or weigh the evidence as permitted by Rule 59, I hold that there was sufficient evidence to find that

---

[10] The subset of these decisions stemming from summary judgment motions are pertinent to the question here of whether it was proper to submit the punitive-damages issue to the jury because "the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard" and "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (internal citation omitted).

Ceja's actions displayed reckless disregard for Decedent's life. First, the jury heard evidence that cast serious doubt on the reliability of the x-rays upon which Ceja based his decision to release Decedent. Ceja testified that the first x-ray taken when Decedent was admitted to JFK Medical failed to show signs of foreign bodies. (T. 180:7-10, 185:11-14.) Ceja knew at this time that Decedent had admitted swallowing heroin pellets to law enforcement. (Id. at 185:15-19.) The next day, on February 24, Ceja took two more x-rays of Decedent. (Id. at 185:20-186:1.) Ceja confirmed prior testimony that he believed he may have seen one pellet in the first of those two x-rays. (Id. at 187:20-25.)[11]  Ceja also admitted that a consulting radiologist, Dr. B.V. Reddy, recommended a CT scan if symptoms persisted and he agreed that a CT scan should be performed for retained foreign bodies. (Id. at 188:7-15.) The same day, Decedent stated he had thirty-four pellets inside his body and had passed twelve by 3:00 pm on that day. (Id. at 189:1-13.) The medical chart from the same day revealed that Decedent could have swallowed anywhere from thirty-three to thirty-five pellets. (Id. at 200:6-8.) Nevertheless, all x-rays to that point had been negative for foreign bodies, except one in which a radiologist reported "suspicious bodies" in an upper quadrant, but Ceja never ordered additional x-rays to investigate further. (Id. at 189:14-15, 190:2-18.)

Plaintiff's expert witness, Dr. Stephen Traub, opined that it was clear the x-rays were unreliable in this case:

[T]he patient, while he was there, passed 33 drug packets, which means that Dr. Ceja knew or should have known that those three X-rays where he only saw one or two actually had 33. So I think you know not once, not twice, but three times, that the X-ray didn't work. Even if

---

[11] Ceja's testimony about his interpretations of the x-rays was inconsistent. At one point, Ceja testified that he had no recollection of treating Decedent, (T. 197:2-4, 198:24-199:2), yet he recalled that he disagreed with radiologists' reports that there were no foreign bodies present on the x-rays, (id. at 197:8-12). He surmised that the absence of a note as to that disagreement in the Decedent's medical charts must have been "a lapse." (id. at 197:13-15.)

you believe the X-ray was good in most cases, which I don't think you should, but even if you did, you know pretty much for a fact it didn't work [for Decedent].

(Id. at 351:18-352:1.) Defendants called Dr. Susan Tiona, who opined that Ceja's actions met the standard of care, (see id. at 856:3-857:2, 858:21-863:14, 867:21-22), but she ultimately conceded that the x-rays were necessarily "wrong" once Decedent began passing pellets, (id. at 924:17-21.)[12]

Second, the jury heard evidence that Decedent's reported pellet count did not match what the x-rays showed, and that Decedent was released from Defendants' care despite Ceja's actual or constructive knowledge that he may still have had one or two pellets in his system. Between February 24 and 28, he continued to pass pellets, passing a total of thirty-three pellets by the morning of February 28. (Id. at 200:6-201:3.) Ceja testified that packet counts provided by body-packing patients were reliable if a doctor could see or count all the pellets in an x-ray. (Id. at 201:8-11.) But the jury heard testimony about Ceja's own case study, featuring a body-packer patient who lied about the number of drug packets she had ingested, (id. at 203:9-23), and Ceja's concession that there were reports of body packers misrepresenting the number of packets in their systems, (id. at 204:16-20). Regardless of the reliability of patient self-reported counts, Ceja testified that he released the patient knowing he had passed only thirty-three pellets after having reported swallowing as many as thirty-five. (Id. at 205:4-20.) The jury heard that Ceja had previously testified at his deposition that he would normally send a patient for a CT scan when

---

[12] Defendants argue that Dr. Tiona's testimony "decisively undermine[s]" any claim that Ceja acted recklessly. (D.E. # 257-1 at 12.) But disagreement between two experts as to the applicable standard of care is not enough for me to conclude that the jury's verdict is "against the weight of the evidence," the standard for granting a new trial on punitive damages. Crabs Unlimited, 745 F. Supp. 2d at 132.

26

there was a discrepancy between pellets reported and pellets found. (Id. at 207:4-17, 280:14-281:2.)

Third, the jury heard evidence of Ceja's awareness that retained drug pellets pose potentially life-threatening injuries. Ceja testified that it was "critical" to ensure that all drug pellets are passed. (Id. at 199:20-22.) He also agreed that, given one single pellet could kill a patient, he would want to err on the side of being conservative. (Id. at 207:13-17.) In the end, Decedent had thirty-seven additional pellets in his body when he died. (Id. at 231:15-19.)

Finally, the jury heard Ceja's testimony expressing ambivalence about the standard of care due Customs and Border Protection detainees, like Decedent, in his care. (Id. at 202:14-203:8.) He testified that he "didn't consider them patients. [He] considered them detainees." (Id. at 202:17-18.) He admitted to testifying earlier at his deposition that he did not believe that Decedent, as a detainee, was entitled to any standard of care nor did he believe he was Decedent's doctor. (Id. at 230:16-231:3.) That evidence supported a finding by a jury that failure to order a CT scan before discharge was similarly "wanton, intentional, [and] reckless." Sultan, 562 N.Y.S.2d at 205.

Accordingly, I reiterate my holding that there was legally sufficient evidence to permit a reasonable juror to find that Ceja's behavior evinced a wanton or reckless disregard for the Decedent's life. Nor did the jury reach a seriously erroneous result or one that constituted a miscarriage of justice by finding as much.

## 2. Amount of Damages

For the reasons discussed above, Defendants' motion for vacatur of the punitive damages award as a matter of law fails to meet the "strict" standard imposed by Rule 50(b). Stubbs, 849

27

F.2d at 85. Although Defendants attack the recoverability of punitive damages as a matter of law, they do not explicitly challenge the amount of punitive damages that the jury awarded. Rather, they indirectly challenge the amount of punitive damages awarded by arguing that "punitive damages have been upheld only in the most egregious and exceptional circumstances" and highlighting facts of cases Defendants contend are more egregious than the instant case. (D.E. # 257-1 at 14-15.) I therefore construe these contentions as arguments in the alternative for remittitur and consider whether the punitive-damages verdict was excessive under Rule 59. See Collado, 396 F. Supp. 3d at 279 (determining jury award was reasonable where Rule 50 and 59 movant did not challenge the award); Peterson v. Cnty. of Nassau, 995 F. Supp. 305, 312 (E.D.N.Y. 1998) ( "A court may, sua sponte, offer a remittitur as an alternative to a new trial." (citations omitted)).

As previously noted, New York law requires trial courts to enter an order of remittitur or additur in actions requiring an itemized verdict if a jury's award of money damages "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). Although there remains some question as to whether Section 5501(c) applies to review of punitive damages awards, see Payne, 711 F.3d at 97 n.8, the Second Circuit recently suggested in dicta that it is appropriate to apply both Section 5501(c) and the federal common law standard when deciding whether remittitur is appropriate, cf. Carroll, 151 F.4th at 83 n.37 (citation omitted) ("[W]e do not make two different rulings because we conclude that the punitive damages award was not unreasonable under either standard."). Accordingly, I apply both standards, starting with New York's "more exacting" standard. See Patterson v. Balsamico, 440 F.3d 104, 119 (2d. Cir. 2006). Under either standard, the punitive damages verdict warrants remittitur.

28

### a. New York Remittitur Standard

The punitive damages award here is out of step with awards in other comparable medical-malpractice suits. Upon reviewing the caselaw of New York courts, it appears that punitive damages awards in medical malpractice cases vary widely—ranging from hundreds of thousands of dollars, where the conduct supporting an award of punitive damages did not result in the death of the decedent, to multi-million dollars, where the conduct supporting punitive damages caused death alongside the presence of systemic failures or aggravating factors.[13] Placing the facts of this case on that spectrum, I conclude that a punitive damages award of $3,000,000 materially deviates from reasonable compensation.

In Garber v. Lynn, 913 N.Y.S.2d 175, 177-78 (App. Div. 2010), the court reduced a punitive damages award from $260,000 to $100,000 ($147,880) for non-fatal dentistry malpractice. There, defendant did not properly fit the plaintiff's bridge, causing her to suffer pain and inability to chew and clean her teeth. Id. She contracted an infection in her jawbone and was forced to undergo extensive dental work to fix it. Id. One of the defendants was not licensed to practice dentistry in New York but nonetheless fitted the problematic bridge. Id. Because the outcome of the culpable conduct in Garber—pain, infection, and further dental work—is far less than the death that occurred because of the culpable conduct here, Plaintiff is entitled to a much larger award than the roughly $150,000 awarded in that case.

Similarly low was the award in Gomez v. Cabatic, 70 N.Y.S.3d 19, 25-29 (App. Div. 2018). There, the Second Department reduced a punitive damages award from $7,500,000 to $500,000 ($653,822) against a doctor who had destroyed her handwritten notes upon receiving records

---

[13] As above, I indicate in internal parentheticals the approximate awards adjusted for inflation as of October 2025, when the verdict in this case was reached.

requests from an attorney representing the decedent in the malpractice suit. The suit arose from that doctor failing to diagnose the decedent with Type I Diabetes. However, in that case, it was the failure to diagnose, not the destruction of medical records, that caused the decedent's death. See id. at 28-29. By contrast here, the conduct warranting punitive damages—Ceja's failure to seek more conclusive testing in the face of a potentially lethal condition and his callous attitude towards the standard of care due Decedent—was a proximate cause of Decedent's death. Thus, the conduct at issue in this case was more culpable and therefore punishable by a higher punitive damages award.

In a case arising under one of New York's public health laws and common-law negligence claims, a lower court recently upheld a $1,000,000 ($996,526)[14] verdict against a nursing home. Serrapica v. S. Shore Rehab. & Nursing Ctr., 88 Misc. 3d 1209(A) at *1, 7-8 (N.Y. Sup. Ct. 2026). The facility failed to turn or position the decedent to avoid ulcers that eventually caused his death. Id. at 4. There, a nursing home's "negligent treatment of pressure ulcers resulting in death" as well as multiple legal violations supported the jury's punitive damages award. Id. at 8. Although Serrapica implicates statutory violations that are inapplicable to this case, it confirms punitive damages awards around this amount are appropriate when, as here, caregivers fail to provide necessary care to prevent a patient's death.

In Brown v. LaFontaine-Rish Med. Assocs., 822 N.Y.S.2d 527, 528-29 (App. Div. 2006), the First Department reduced punitive damages from $5,000,000 to $2,500,000 ($4,015,387) for more egregious conduct than what occurred in this case. There, the anesthesiologist-defendant was not permitted to practice without supervision but did so anyway, and complications from

---

[14] This award adjusted for inflation reflects the fact that Serrapica's verdict was reached after the verdict in this case.

30

anesthesia were the decedent's cause of death. Id. The surgeon-defendant never met the decedent nor obtained consent for the surgery. Id. Rather, the surgeon filled in for another physician after the surgery had already begun. Id. The operating room also lacked a working laryngoscope, which could have been used to resuscitate the decedent. Id. Additionally, the clinic misrepresented its affiliation with talented surgeons while failing to verify its doctors' credentials. Id. It billed insurance companies for procedures that were not medically necessary. Id. Whereas Brown featured both systemic and patient-specific failures, the case at hand primarily concerned Ceja's failure seek the appropriate testing—the CT scan—despite overwhelming factors requiring it in Decedent's specific situation. In Brown, there was also "ample evidence of reprehensible conduct evincing a gross indifference to patient care," making a higher award more appropriate than in this case where that evidence was both more limited and less reprehensible.

I find that the case at hand concerns conduct more reprehensible than that of Serrapica and less than that of Brown. The $3,000,000 awarded by the jury thus deviates materially from what would be reasonable compensation. To make the award more "consistent with the norms that prevail in [the New York tort] system," Payne, 711 F.3d at 96, I will order a new trial as to the amount of punitive damages unless Plaintiff agrees to remittitur reducing the punitive damages award to $1,500,000.

### b. Federal Remittitur Standard

I reach the same conclusion as to remittitur after applying the federal standard. When federal courts review punitive-damages awards, "a degree of excessiveness less extreme than 'grossly excessive' will support [granting] a new trial or remittitur of damages." Turley v. ISG

31

Lackawanna, Inc., 774 F.3d 140, 164 (2d Cir. 2014) (quoting Payne, 711 F.3d at 97). Punitive

damages awards must be "'fair, reasonable, predictable, and proportionate,' to avoid extensive

and burdensome social costs, and to reflect the fact that punitive awards are imposed without the

protections of criminal trials." Id. (quoting Payne, 711 F.3d at 93-96).

The Supreme Court has identified three "guideposts" for reviewing punitive damages awards,

which "apply irrespective of whether [my] review is constitutional or supervisory in nature." Id.

at 165. Those guideposts are (1) "'the degree of reprehensibility' associated with the defendants'

actions," (2) "'the disparity between the harm or potential harm suffered' and the size of the

punitive award," and (3) "the difference between the remedy in this case and the penalties

imposed in comparable cases." Id. (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575

(1996)).

Pre-Payne case law explained that courts should disturb a punitive-damages award only if it

"shock[ed] [the] judicial conscience," Id. at 164 n.23, but post-Payne cases suggest that the

standard has been collapsed into the "lower standard introduced by Gore," meaning that "the

judicial conscience is now . . . more easily shocked." Payne, 711 F.3d at 97. In the recent Carroll

opinion, the Second Circuit exclusively reviewed the punitive-damages award under the

standards for excessiveness outlined in Payne and Gore and did not apply the shocks-the-

conscious standard. Carroll, 151 F.4th at 82-86.

### i.   Degree of Reprehensibility

The first factor, the "degree of reprehensibility," is "the most important indicium of the

award's reasonableness." Motorola Credit Corp. v. Uzan, 509 F.3d 74, 85 (2d Cir. 2007)

(quoting Gore, 517 U.S. at 575) (alteration adopted). "In assessing reprehensibility, we consider

both the defendant's conduct and its natural consequences." Stampf, 761 F.3d at 209 (citing Gore, 517 U.S. at 57-76). Conduct is more reprehensible when it involves deceit or malice versus negligence and if it could cause serious physical or emotional damage versus economic damage or minor injury. Stampf, 761 F.3d at 209.

The record in this case indicates a moderately high degree of reprehensibility. On one hand, the culpable conduct here did not involve deceit or malice. Ceja's decision not to order a CT scan, despite his actual or constructive knowledge that Decedent retained pellets in his system, demonstrated "conscious and deliberate disregard of" Decedent's life, but did not display any intent to deceive the Decedent or to act maliciously toward him. Dupree, 20 N.Y.3d at 924. Rather, the jury found that it was Decedent's own deceit that contributed to his death; he was found forty-seven percent at fault insofar as he misrepresented to his healthcare providers the number of pellets he swallowed. (D.E. # 246 at 4.) These findings imply a lower degree of reprehensibility.

On the other hand, releasing Decedent without taking an available precaution to make sure he was free of life-threatening foreign objects—after receiving conflicting pellet counts from the Decedent himself and obviously unreliable x-ray results—was exceedingly likely to result, and did in fact result, in death or very serious physical damage. Ceja himself acknowledged that fatality could result from just one retained pellet. (T. 207:13-17.) Ceja also expressed views that "detainees" in his care may not have been entitled to the same standard of care that patients in other contexts are. (Id. at 201, 230-31.) Furthermore, Ceja's failure to order a CT scan was not an isolated incident. Rather, he testified that in his twenty-four years at JFK Medical, he had never ordered a CT scan for a body-packing patient. (T. 212:4-13.) If the jury concluded that withholding proper testing was connected to his views that detainees were due a lower standard

33

of care than regular patients, that conduct would certainly warrant punitive damages "to punish the defendant and to deter him and others from similar conduct in the future." Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996) (quotations and citation omitted).

In sum, Ceja's conduct was reprehensible and justified the imposition of punitive damages. But the record is devoid of any evidence of malice or deceit, and Decedent's comparative fault decreases the degree of reprehensibility present here. As such, the first and most important Gore factor supports reducing the punitive damages award.

### ii.      Disparity Between Harm and Size of Award

The second guidepost concerns "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." See Gore, 517 U.S. at 581 (internal quotation marks omitted). On this measure, courts look to the ratio of punitive to compensatory damages. See Turley, 774 F.3d at 165.

Here, the jury awarded $3,000,000 in punitive damages award and $2,170,000 in compensatory damages award. I reduced the latter award to $1,809,000 supra Section II.B.1.b. The resulting ratio is roughly 1.66:1. See Stampf, 761 F.3d at 211 (calculating ratio from adjusted compensatory damages). As a threshold matter, Defendants do not challenge this award as unconstitutional, and the ratio here does not approach a due process violation. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (noting that four-to-one ratio "might be close to the line of constitutional impropriety" (citation omitted)). I find that the ratio here is reasonable, especially because the jury awarded $0 in lost earnings, (D.E. # 246 at 2), and I have reduced the other compensatory damages to conform to awards in similar New York cases. Cf.

State Farm, 538 U.S. at 425 (noting as part of due process analysis that higher ratios can be reasonable when compensatory damages are lower). The second Gore factor weighs against remittitur.

### iii.      Comparison with Penalties Imposed in Similar Cases

Finally, "[c]ourts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." See Payne, 711 F.3d at 104; Carroll, 151 F.4th at 85. As discussed supra Section II.C.2.a, and "focus[ing] . . . on whether the verdict lies within the reasonable range," Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 671 (2d Cir. 2012) (cleaned up), this punitive-damages award is higher than penalties imposed in similar cases. The third Gore factor thus supports remittitur.

Applying the federal standard for remittitur, I find that two of the three Gore factors, including the most important one, support reducing the punitive damages award and therefore reiterate my holding earlier that the punitive damages award will be reduced to $1,500,000 unless Plaintiff agrees to a new trial as to the amount of punitive damages that should be imposed.

### 3. Defendants Waived Objections to the Jury Instructions

Defendants claim that I erred in two ways when I instructed the jury on punitive damages. First, they argue that I should have instructed the jury that they must find Plaintiff's entitlement to punitive damages by clear and convincing evidence, and second, I should not have instructed the jury to consider the Defendants' financial circumstances in reaching an amount of punitive damages. (D.E. # 257-1 at 5-6.) Only in their reply do Defendants claim that these alleged errors affected their substantial rights, but they do not support that position. (See D.E. # 261 at 5.)

35

### a. Waiver

Parties must timely object to jury instructions with sufficient specificity. Palmer v. Hoffman, 318 U.S. 109, 119 (1943) ("Where a party might have obtained the correct charge by specifically calling the attention of the trial court to the error and where part of the charge was correct, he may not through a general exception obtain a new trial.") As such, parties who wish to object to a court's jury instruction or verdict sheet "must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "Rule 51 requires parties to articulate and lodge their objections to jury charges before they are delivered so that 'the trial court [will have] an opportunity to cure any defects in the instructions before sending the jury to deliberate.'" ING Glob., 757 F.3d at 97 (quoting Jacques v. DiMarzio, Inc., 386 F.3d 192, 200 (2d Cir. 2004)).

Defendants had a full and fair opportunity to object to the punitive-damages charge on the specific grounds they now raise but failed to do so at a time that gave me an opportunity to cure the alleged defects. I ordered the parties to provide draft jury instructions and object to each other's. (Text Order dated Sept. 24, 2025). Defendants' draft instructions included the New York Pattern Jury Instruction ("PJI") on punitive damages—the very charge they now claim was given in error. (D.E. # 193 at 4-5.) Indeed, before trial, they requested that the charge "come directly from the PJI" and faulted Plaintiff's proposed punitive damages charge for being "critically inconsistent with the PJI," (D.E. # 198 at 1, 2), although the defendants ultimately objected to giving any charge on punitive damages, (D.E. # 222). During trial, I provided the parties with multiple opportunities to make objections on the record to the language of the charge. (See, e.g., T. 627:9-637:25649:20-650:2, 771:17-776:14, 781:5-781:18, 782:21-24, 792:3-832:19, 972:4-25, 974:5-15; 1062:22-1080:8.) At no point did Defendants raise either the issue of the standard

36

of proof for punitive damages or the "financial circumstances of the Defendant" language. (See id. at 624:9- 625:3; 635:24-25; 773:21-774:1; 814:5-815:24; 817:13-818:8; 826:13-831:26.) Moreover, their general objections about the inclusion of a punitive-damages charge cannot stand in for the objections to specific language they raise. See Palmer 318 U.S. at 119 (when charge is generally correct, "a general exception is not sufficient" and objections "must be sufficiently specific to bring into focus the precise nature of the alleged error."); Jin v. Metro. Life Ins. Co., 310 F.3d 84, 93-94 (2d Cir. 2002).

Rules 51, 50, and 59 all contemplate heightened standards for granting relief for errors in jury instructions that were given when parties, like Defendants here, failed to timely and specifically object to those instructions. In the absence of timely objections, Rule 51(d)(2) provides that I "may consider a plain error in the instructions that has not been preserved as required . . . if the error affects substantial rights."

The Second Circuit has instructed that, as to Rule 50(b) challenges to jury instructions already given,

> The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice."

ING Glob., 757 F.3d at 97. "Manifest injustice exists where a jury's verdict is wholly without legal support." Id. (citations omitted).

Rule 59 has a similarly elevated standard. "Where claimed errors were not preserved by objections contemporaneously at trial, 'a new trial will be granted only for error that was so serious and flagrant that it goes to the very integrity of the trial,' because 'failure to object

deprives the trial court of the opportunity to correct the error during trial.'" <u>Zsa Zsa Jewels, Inc.</u> <u>v. BMW of N. Am., LLC</u>, No. 15-CV-6519 (KAM) (RLM), 2023 WL 3455057, at *12 (E.D.N.Y. May 15, 2023) (quoting <u>Marcic v. Reinauer Transp. Cos.</u>, 397 F.3d 120, 124 (2d Cir. 2005)); <u>see also</u> <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 160 (2d Cir. 2012) (internal citations omitted) (holding that party's failure to object at trial to verdict form "waives its right to a new trial on that ground and [party] has no right to object to such matters on appeal . . . unless the error is fundamental.") Fundamental errors are "more egregious" than "plain" errors—they are the errors that "deprived the jury of adequate legal guidance to reach a rational decision." <u>Jarvis</u> <u>v. Ford Motor Co.</u>, 283 F.3d 33, 62 (2d Cir. 2002) (quotations and citations omitted).

### b. Instruction on Burden of Proof for Imposing Punitive Damages

There was no manifest injustice, nor did I fundamentally err by failing to instruct the jury on the heightened burden of proof for awarding punitive damages. My punitive damages charge was nearly identical to the New York Pattern Jury Instruction on punitive damages. <u>Compare</u> N.Y. Pattern Jury Instr.—Civil 2:278 <u>with</u> (D.E. # 245 at 20-21). "A jury charge is generally proper under New York law when it comports with the pattern jury instructions." <u>Haynes v. Att'y Gen.</u> <u>of New York</u>, No. 19-CV-1814 (DC), 2023 WL 2021056, at *8 (E.D.N.Y. Feb. 15, 2023) (Chin, J.) (citing <u>People v. Curran</u>, 32 N.Y.S.3d 309, 312 (App. Div. 2016)).

Defendants overstate the certainty of New York law as to the burden of proof required to impose punitive damages. They fail to acknowledge that "[t]he Appellate Divisions in New York are divided over whether punitive damages must be shown by clear and convincing evidence or a preponderance of the evidence." <u>In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.</u>, 725 F.3d 65, 127 n.49 (2d Cir. 2013), <u>cert.</u> <u>denied</u>, 572 U.S. 1080 (2014); <u>see also</u> Caveat 1 to

38

the N.Y. Pattern Jury Instr.—Civil 2:278 (collecting cases). The Second Circuit has repeatedly held that it is not fundamental error where a district court declines to instruct the jury on unsettled New York law. See Jarvis, 283 F.3d at 62-63. Indeed, "[w]hen conducting plain error review, moreover, [courts] typically will not find fundamental error if 'the operative legal question is unsettled.'" Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 50 (2d Cir. 2015) (quoting Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 122 (2d Cir. 2004)). I did not err by failing to instruct the jury on an issue the New York Court of Appeals has not yet decided.

Even if it was error not to specify a clear-and-convincing standard, any error was not "fundamental" because I properly instructed the jury on the high bar the plaintiff must clear to be awarded punitive damages in New York. (See D.E. # 245 at 20-21 (stating the requirements, among others, that jury find "high degree of immorality"; "utter disregard"; "reprehensibility" in defendants' actions to impose punitive damages).) For the reasons stated supra Section II.C.1, the jury would have reached the same verdict whether I charged that they had to find for the plaintiff on punitive damages by clear and convincing or a preponderance of the evidence. See Barkley v. United Homes, LLC, No. 04-CV-875 (KAM) (RLM), 2012 WL 2357295, at *15 (E.D.N.Y. June 20, 2012), aff'd sub nom. Barkley v. Olympia Mortg. Co., 557 F. App'x 22 (2d Cir. 2014), as amended (Jan. 30, 2014) (finding that "under either standard, there was sufficient evidence to satisfy the stringent legal standards that govern punitive damages awards").

### c. Instructions on Defendants' Financial Circumstances

Defendants' allegation that it was error to charge the jury to consider the Defendants' financial condition similarly fails. I charged the jury that they "may consider the defendants' financial condition and the impact [the] punitive damages award will have on them." As above,

39

this language is identical to that of the New York Pattern Jury Instructions. (Compare D.E. # 245 at 21 with N.Y. Pattern Jury Instr.—Civil 2:278.) My verdict sheet asked the jury to decide whether Ceja alone had acted in such a way to be responsible for punitive damages. (D.E. # 246 at 4.) Defendants never objected to this language in my draft instructions or verdict sheet. Accordingly, this challenge is waived.[15]

Moreover, to the extent that Defendants argue that the charge somehow constituted fundamental error or caused manifest injustice because there was no evidence of Ceja's financial condition, I instructed the jury twice not to speculate about matters not in evidence, (D.E. # 245 at 5), which would have included Ceja's wealth, and "[a] jury is presumed to follow the court's instructions," Martinez v. Lilley, No. 21-CV-6912 (KAM), 2024 WL 3498523, at *24 (E.D.N.Y. July 22, 2024), appeal dismissed (Jan. 22, 2025). Plaintiff made no mention of Ceja's financial condition in her summation. (See T. 1009:16-1010:11.) As such, the inclusion of the instruction to consider Ceja's financial condition was, at worst, superfluous, but it cannot be said that it rose to the level of fundamental error.

It was not erroneous—fundamental or otherwise—to charge the jury that they were permitted to consider Ceja's financial condition in deciding the amount of punitive damages to impose. Nor did it cause manifest injustice.

---

[15] I note that Ceja was entitled to offer evidence of his financial condition but chose not to do so. He belatedly did so after trial, when Ceja sought to stay the entry of judgment because he "does not have sufficient assets to post the necessary collateral for a $3 million bond." (D.E. # 269-8 at 4.) Ceja could have, but failed to, presented evidence of that financial condition at trial to mitigate a potential punitive-damages award against him. Provost v. City of Newburgh, 262 F.3d 146, 163 (2d Cir. 2001) ("Under well established precedent in this Circuit, it is the defendant[s'] burden to show that [their] financial circumstances warrant a limitation of the award." (internal quotations omitted)).

## CONCLUSION

For the reasons stated above, Defendants' motion for judgment as a matter of law on the issues of causation, punitive damages, and Rachelly De La Rosa's entitlement to compensatory damages is denied. Defendants' motion to reduce the funeral-expenses damages award to $9,000 is granted. Defendants' motion for a new trial as to the amounts of punitive damages and compensatory damages for Mariela De La Rosa, Isandra De La Rosa Encarnacion, and Juan Jose De La Rosa Aybar is granted unless Plaintiff agrees in writing on the docket by June 29, 2026 to accept a reduction of the following damages:

- For punitive damages from $3,000,000 to $1,500,000;
- For compensatory damages for Mariela De La Rosa from $500,000 to $350,000;
- For compensatory damages for Isandra De La Rosa Encarnacion from $200,000 to $100,000; and
- For compensatory damages for Juan Jose De La Rosa Aybar from $200,000 to $100,000.

SO ORDERED.

/s/ Carol Bagley Amon

Dated: June 12, 2026

Brookyln, New York

Carol Bagley Amon

United States District Judge